# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **SOUTHWESTERN BELL TELEPHONE COMPANY, BELLSOUTH TELECOMMUNICATIONS, INC., ILLINOIS BELL TELEPHONE COMPANY, INC., MICHIGAN BELL TELEPHONE COMPANY, NEVADA BELL TELEPHONE COMPANY, PACIFIC BELL TELEPHONE COMPANY, THE OHIO BELL TELEPHONE COMPANY, THE SOUTHERN NEW ENGLAND BELL TELEPHONE COMPANY, and WISCONSIN BELL, INC.,** | § § § § § § § § § § § § | |
| **Plaintiffs,** | § § | **CIVIL ACTION NO.  09-CV-1268** |
| **vs.** | § § | |
| **IDT TELECOM, INC., ENTRIX TELECOM, INC., and JOHN DOES 1-10** | § § § | |
| **Defendants.** | § | |

---

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO STAY BASED ON THE DOCTRINE OF PRIMARY JURISDICTION OR, IN THE ALTERNATIVE, TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6) FOR FAILURE TO STATE A CLAIM

---

Tammy S. Wood
Texas Bar No. 00788713
BELL NUNNALLY & MARTIN LLP
322 McKinney Avenue, Suite 1400
Dallas, Texas 75204-2429
(214) 740-1400
(214) 740-1499 (facsimile)
tammyw@bellnunnally.com

**ATTORNEYS FOR DEFENDANTS**
**IDT TELECOM, INC. AND**
**ENTRIX TELECOM, INC.**

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................. 3

    A.  Regulatory Framework ................................................................................ 3

    B.  Prepaid Calling Cards ................................................................................. 4

    C.  FCC Decisions and Pending FCC Proceedings ......................................... 5

        1.  The June 30 FCC Order ........................................................................ 5

        2.  The Arizona Dialtone Request for Reconsideration ............................ 6

III. LEGAL ARGUMENT ....................................................................................... 7

    POINT I - PLAINTIFFS' CLAIMS SHOULD BE STAYED PURSUANT
    TO THE DOCTRINE OF PRIMARY JURISDICTION ................................... 7

    A.  The Issues Raised by the Complaint Are Already Before the FCC ..................... 9

    B.  The Issues Raised By the Complaint Have Not Been Resolved by the FCC ...... 10

    C.  This Dispute Should Be Resolved On An Industry-wide Basis .......................... 12

    POINT II - PLAINTIFFS' CLAIMS FAIL TO STATE A CLAIM
    UPON WHICH RELIEF COULD BE GRANTED ........................................ 15

    A.  12(b)(6) Standard ..................................................................................... 16

    B.  The Complaint Fails To State Claims For Breach of Tariffs ............................. 16

        1.  Plaintiffs Fail to Identify Which Tariffs and Which Provisions
            of Those Tariffs IDT Telecom Allegedly Breached ............................... 17

        2.  There Was No "Offer and Acceptance" Resulting in a Contract ........... 19

        3.  No FCC Regulation or Order Binds IDT Telecom to
            The Tariffs, Compels IDT Telecom to Use the Services
            Under Tariff or Varies the Express Terms of the Tariffs ....................... 20

    C.  The Complaint Fails to State Claims for Unjust Enrichment ............................. 21

IV. CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*3 Rivers Tel. Coop., Inc. v. U.S. West Communications, Inc.,*
    45 Fed. Appx. 698, 2002 U.S. App. LEXIS 18196 (9th Cir. 2002) ................................ 20

*A.S.I. Worldwide Communications Corp. v. WorldCom,*
    115 F. Supp. 2d 201 (D.N.H. 2000) ........................................................................ 22, 26

*Access Charge Reform,*
    CC Docket No. 96-262, First Report and Order, 26 FCC Rcd 15982 (1997) ................... 5

*Access Charge Reform,*
    CC Docket No. 96-262, CCB/CPD File No. 01-19, 19 FCC Rcd 9108 (2004) ................ 5

*Access Charge Reform Order,*
    Access Charge Reform, Reform of Access Charges Imposed by Competitive Local
    Exchange Carriers, CC Docket No. 96-262, Seventh Report and Order,
    16 FCC Rcd 9923 (2001) ........................................................................................... 5

*Advance United Expressways v. Eastman Kodak Co.,*
    965 F.2d 1347 (5th Cir. 1992) ...................................................................................... 8

*AMC Liquidating Trust v. Sprint Communications Co., L.P.,*
    295 F. Supp. 2d 650 (M.D. La. 2003) ........................................................................... 8

*American Trucking Ass'n v. ICC,*
    682 F.2d 487 (5th Cir.1982) ........................................................................................ 10

*Arguijo v. Owens,*
    No. 4:08-CV-140-A, 2008 WL 2388903 (N.D. Tex. June 9, 2008) ............................... 16

*Ashcroft v. Iqbal,*
    __ U.S. __, 129 S. Ct. 1937 (2009) ............................................................................. 16

*AT&T Co. v. Delta Communications Corp.,*
    114 F.R.D. 606 (S.D. Miss. 1986) ................................................................................. 8

*Bell Atlantic v. FCC,*
    206 F.3d 1 (D.C Cir. 2000) .......................................................................................... 10

*Buxani v. Nussbaum,*
    940 S.W.2d 350 (Tex. App.—San Antonio 1997, no pet.) ............................................ 19

*Carter v. Am. Telephone & Telegraph Co.,*
   365 F.2d 486 (5th Cir. 1966) .......................................................................... 9

*Coffel v. Stryker Corp.,*
   284 F.3d 625 (5th Cir. 2002) ........................................................................ 19

*Comment Sought on Missoula Intercarrier Compensation Reform Plan,*
   CC Docket No. 01-92, Public Notice, 21 FCC Rcd 8524 (2006) ..................... 5

*Davel Communications, Inc. v. Qwest Corp.,*
   460 F.3d 1075 (9th Cir. 2006) ...................................................................... 21

*Developing a Unified Intercarrier Compensation Regime,*
   CC Docket No. 01-92, Further Notice of Proposed Rulemaking,
   20 FCC Rcd 4685 (2005) ......................................................................... 5, 23

*Developing a Unified Intercarrier Compensation Regime,*
   CC Docket No. 01-92, Notice of Proposed Rulemaking,
   16 FCC Rcd 9610 (2001) ......................................................................... 5, 24

*Halprin, Temple, Goodman & Sugrue v. MCI Telecomms. Co.,*
   Order on Reconsideration, 14 FCC Rcd 21092 (1999) ................................. 21

*Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,*
   Inter carrier Competition for ISP-Bound Traffic,
   CC Docket Nos. 96-98, 99-68, Order on Remand and Report and Order,
   16 FCC Rcd 9151 (2001) .............................................................................. 11

*In re Regulation of Prepaid Calling Card Services,*
   21 FCC Rcd 7290 (June 30, 2006) ................................................................. 4

*In the Matter of American Network, Inc. Petition for Declaratory Ruling Concerning Backbilling of Access Charges,*
   4 FCC Rcd. 550 (1989) ................................................................................ 19

*MTS and WATS Market Structure,*
   Phase I, Third Rep. & Order, 93 FCC 2d 241 (1983) ..................................... 3

*NARUC v. FCC,*
   746 F.2d 1492 (D.C. Cir. 1984) .................................................................... 10

*Northwinds Abatement, Inc. v. Employers Ins. of Wausau,*
   69 F.3d 1304 (5th Cir. 1995) .......................................................................... 7

*Papasan v. Allain,*
   478 U.S. 265 (1986) ..................................................................................... 16

*Penny v. Southwestern Bell Telephone Co.,*
    906 F.2d 183 (5th Cir. 1990) ........................................................... 2, 7

*Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt
    from Access Charges,*
    WC Docket No. 02-361, Order, 19 FCC Rcd 7457 (2004)............................................ 5

*Petition of WorldCom, Inc., et al,*
    Pursuant to § 252(e)(5) of the Communications Act for Preemption of the Jurisdiction
    Of the Virginia State Corporation Comm'n, Memorandum Opinion and Order,
    Wireline Comp. Bur., 17 FCC Rcd 27039 (2002)............................................ 24

*Policies and Rules Concerning Local Exchange Carrier Validation and Billing Information for
    Joint Use Calling Cards, Mem. Op. and Order,*
    on Reconsideration, 12 FCC Rcd 1632 (1997) ............................................ 21

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
    237 F.3d 1359 (Fed. Cir. 2001) ........................................................... 14

*Qwest Corp. v. FCC,*
    252 F.3d 462 (D.C. Cir. 2001) ........................................................... 24

*Regulation of Prepaid Calling Card Services,*
    WC Docket No. 05-68, Declaratory Ruling and Report and Order
    21 FCC Rcd 7290 (2006) ........................................................... 4, 5

*Staton Holdings, Inc. v. MCI Worldcom Communications, Inc.,*
    No. Civ.A. 399CV2876D, 2001 WL 1041796 (N.D. Tex. Sept. 4, 2001) ...................... 22

*TSR Wireless, LLC. v. U S West Communications, Inc., Memorandum,*
    Opinion and Order, 15 FCC Rcd. 11166 (June 21, 2000)............................................ 24

*US West, Tariff FCC Nos. 3 and 5, Trans. No.,*
    629, Order, 10 FCC Rcd 13708 (1995) ........................................................... 21

*Van Zanen v. Qwest Wireless, L.L.C.,*
    522 F.3d 1127 (10th Cir. 2008)........................................................... 24

*Wagner & Brown v. ANR Pipeline Co.,*
    837 F.2d 199 (5th Cir.1988) ........................................................... 8

*WorldCom, Inc. v. FCC,*
    288 F.3d 429, 432-34 (D.C. Cir. 2002) ................................................... 11, 12

### STATE CASES

*American Civil Liberties Union v. Miller,*
    803 S.W.2d 592 (Mo. 1991) ........................................................................................ 23

*Erlson v. Vee-Jay Cement Contracting Co.,*
    728 S.W.2d 711 (Mo. Ct. App. 1987) ........................................................................ 22

*Farmers New World Life Insurance Co. v. Jolley,*
    747 S.W.2d 704 (Mo. Ct. App. 1988) ........................................................................ 25

*Frontier Telephone of Rochester, Inc. v. USA Datanet Corp.,*
    386 F. Supp. 2d 144 (W.D.N.Y. 2005) ................................................................ 8, 11

*Heldenfels Bros., Inc. v. City of Corpus Christi,*
    832 S.W.2d 39 (Tex. 1992) ................................................................................ 22, 25

*Hirsch v. Bank of America,*
    107 Cal. App. 4th 708 (Cal. Ct. App. 2003) ...................................................... 22, 23

*In re Worldcom, Inc. Secs. Litig.,*
    No. 02 Civ.3288(DLC), 2006 WL 751382 (S.D.N.Y. Mar. 24, 2006) ...................... 17

*Industrial Leasing Corp. v. GTE Northwest Inc.,*
    818 F. Supp. 1372 (D. Or. 1992) .............................................................................. 16

*Johnson v. McDonnell Douglas Corp.,*
    745 S.W.2d 661 (Mo. 1988) ...................................................................................... 19

*McMickle v. Arkansas Tel. Co.,*
    No. 4:08-cv-324 SWW, 2009 WL 928895 (E.D. Ark. Apr. 3 2009) ........................ 16

*MCI Worldcom Network Services, Inc. v. Paetec Communications, Inc.*
    No. 04-1479 (E.D. Va. Aug. 31, 2005) .................................................................... 19

*Meyer v. Benko,*
    55 Cal. App. 3d 937 (Cal. Ct. App. 1976) ................................................................ 19

*MyVitaNet.com v. Kowalski,*
    No. 2:08-cv-48, 2008 WL 203008 (S.D. Ohio Jan. 22, 2008) ................................ 14

*Pfeil v. Sprint Nextel Corp.,*
    504 F. Supp. 2d 1273 (N.D. Fla. 2007) .................................................................... 22

*Red Shield Ins. Co. v. Barnhill Marina & Boatyard, Inc., No. C ,*
    08-02900 WHA, 2008 WL 3271052 (N.D. Cal. Aug. 7, 2008) ................................ 18

*Southwest Louisiana Healthcare Sys. v. MBIA Ins.,*
   Co., No. 05-1299, 2008 WL 5155752 (W.D. La. Dec. 8, 2008) ...................................... 17

*Southwestern Bell Tel. L.P. v. Global Crossing Ltd., No.,*
   4:04-CV-1573(CEJ), 2008 WL 4938409 (E.D. Mo. Nov. 14, 2008) ................................ 8

*Sprint Spectrum L.P. v. AT&T Corp.,*
   168 F. Supp. 2d 1095 (W.D. Mo. 2001) ......................................................................... 8

*Villarreal v. Grant Geophysical, Inc.,*
   136 S.W.3d 265 (Tex. App.—San Antonio 2004, pet. denied) ........................... 24, 25, 30

*Wolf v. Rare Medium, Inc.,*
   171 F. Supp. 2d 354 (S.D.N.Y. 2001) ......................................................................... 17

*Ziegler v. Findlay Indus., Inc.,*
   464 F. Supp. 2d 733 (N.D. Ohio 2006) ....................................................................... 24

## STATUTES

47 U.S.C. § 203(c) ....................................................................................................... 19

47 U.S.C. § 251(b)(5) ........................................................................................ 3, 11, 12

47 U.S.C. § 251(g) ....................................................................................................... 12

47 U.S.C. § 252(d)(2)(A) ............................................................................................... 3

## RULES

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1, 25

## REGULATIONS

47 C.F.R. § 51.703(b) ................................................................................................. 23

Defendants IDT Telecom, Inc. and Entrix Telecom Inc. (collectively, "IDT Telecom") respectfully submit this memorandum of law in support of their motion to stay this action brought by Southwestern Bell Telephone Company and nine other local exchange carriers (collectively, "Plaintiffs") until the regulatory issues raised by the Complaint are resolved by the Federal Communications Commission ("FCC").  In the alternative, IDT Telecom respectfully asks the Court to dismiss Plaintiffs' causes of action seeking "switched access" fees from IDT Telecom because:

- Plaintiffs have failed to allege a necessary prerequisite for its claims that IDT Telecom violated federal and state tariffs:  that IDT Telecom ordered any services from Plaintiffs. Indeed, the Complaint alleges that IDT Telecom had <u>no</u> agreement whatsoever with Plaintiffs and instead contracted with third parties unrelated to Plaintiffs.

- Plaintiffs have failed to allege the elements of an unjust enrichment claim because they cannot show that (i) they conferred any benefit on IDT Telecom since Plaintiffs did not provide any services to IDT Telecom; (ii) they have suffered any damages since they have received compensation for their services, and (iii) it is unjust to permit IDT Telecom to contract with third parties instead of with Plaintiffs.

## I.    <u>INTRODUCTION</u>

Plaintiffs' lawsuit is a transparent attempt to use litigation to undermine ongoing regulatory proceedings pending before the FCC.  Local exchange carriers ("LECs") already have asked the FCC to determine whether prepaid calling card providers, like IDT Telecom, must pay switched access charges to LECs, like Plaintiffs, when local calls are made to local numbers owned by third parties and then forwarded to the prepaid calling card service provider's platform by the third party, here competitive local exchange carriers ("CLECs").  Thus, the FCC is actively considering the exact issues raised by the Complaint.  IDT Telecom, therefore, moves the Court to stay this action based on the doctrine of primary jurisdiction.  Plaintiffs' claims require the Court to resolve legal, technical and policy issues that fall within the purview of the FCC's authority and established expertise.  Because the FCC already is considering these exact

issues in ongoing proceedings, the judicial resolution that Plaintiffs seek risks inconsistent outcomes.  Moreover, this matter raises public policy concerns regarding whether Plaintiffs are using piecemeal litigation to promote their services and effectively prohibit prepaid calling card providers from purchasing services from CLECs that compete with Plaintiffs.  Thus, the Court should defer to the FCC's primary jurisdiction and stay Plaintiffs' claims to allow the FCC to resolve the predicate issues that lie within its expertise.

Plaintiffs bring this action against IDT Telecom based on the mistaken assumption that Plaintiffs provided switched access services to IDT Telecom and that they are entitled to collect "switched access charges" from IDT Telecom under certain unidentified federal and state tariffs. Plaintiffs' allegations, however, skip over several predicate questions that must be answered before any liability issues can be decided in this case.  Most fundamentally, Plaintiffs' claims would require the Court to determine whether Plaintiffs' tariffs even apply to IDT Telecom.  As the Complaint acknowledges, the FCC has been actively addressing regulatory issues regarding calling card products and the applicability of certain switched access charges to various calling card products.  (*See* Compl. ¶¶ 29-31).  Accordingly, resolution of the causes of action set forth in the Complaint requires consideration of thorny issues of law and fact, all of which feature prominently in ongoing FCC proceedings relating to prepaid calling cards.

The Fifth Circuit has held that courts should defer to the primary jurisdiction of an administrative agency with respect to questions that require the technical and policy expertise of the agency.[1]  Here, Plaintiffs raise a host of such questions, all of which lie within the special expertise and competence of the FCC.  This Court should recognize the primary jurisdiction of the FCC and stay Plaintiffs' claims pending the FCC's resolution of these predicate questions.

---

[1] *See Penny v. Southwestern Bell Tel. Co.*, 906 F.2d 183, 187 (5th Cir. 1990) ("Hence, primary jurisdiction 'comes into play whenever enforcement of the claim requires the resolution of issues [which, under a regulatory scheme, have been placed] within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.'").

## II.    <u>BACKGROUND</u>

### A.    <u>Regulatory Framework</u>

The Complaint proceeds on two assumptions both of which raise fundamental predicate questions within the FCC's area of expertise.  Plaintiffs assume that:  (i) they are owed "switched access charges" for local calls made by their customers on calling cards even though those calls are handed off to CLECs and not IDT Telecom; and (ii) it is the prepaid calling card companies' responsibility for making these payments.  As explained below, the history behind these issues shows that resolution of Plaintiffs' claims requires the FCC's technical and policy expertise.

Following the court-ordered break-up of AT&T's telecommunications monopoly in the early 1980s, the FCC directed local telephone companies (known as "local exchange carriers" or "LECs") to create a system of "carrier's carrier" charges that LECs (like Plaintiffs) would levy on long-distance companies (known as "inter-exchange carriers") for origination and termination of long-distance calls.  *See, e.g.*, MTS and WATS Market Structure, Phase I, Third Rep. & Order, 93 FCC 2d 241, 244 ¶ 6 (1983).  After implementation of the Telecommunications Act of 1996, new competitive local telephone companies (called "competitive local exchange carriers" or "CLECs") began to offer their own services in competition with the incumbent LECs' services.  As a result, the 1996 Communications Act required each LEC to enter into "reciprocal compensation arrangements" under which a LEC that terminates traffic that originated on another LEC's network (*i.e.*, connects local calls to its customers from a local competitor's customers) may recover a "just and reasonable" charge from the originating LEC.  *See* 47 U.S.C. §§ 251(b)(5), 252(d)(2)(A).  Although the FCC initially limited reciprocal compensation payments to traffic designated as "local," it subsequently reversed that limitation, ruling that reciprocal compensation applies to "all telecommunications traffic," except for exchange access

traffic carved-out by the operation of yet another provision of the Communications Act.   Those carve out exclusions are not applicable here.

## B.    <u>Prepaid Calling Cards</u>

Prepaid calling cards provide consumers the ability to place long-distance calls without presubscribing to an interexchange carrier or using a credit card.   A calling card customer typically dials a number to reach the service provider's centralized switching platform and the platform then requests the unique personal identification number associated with the card for verification and billing purposes.   When prompted, the consumer then dials the destination number and the platform routes the call to the intended recipient.   The prepaid calling card is then debited based on the price of the completed call.   *See In re Regulation of Prepaid Calling Card Services*, 21 FCC Rcd 7290, ¶ 2 (rel. June 30, 2006) (the "June 30 FCC Order").   At issue in the Complaint are calls that are initiated by the customer dialing local access numbers, not the 8YY numbers which were at issue in the in the June 30 FCC Order.

To provide prepaid calling card consumers with the local number for them to dial, IDT Telecom purchases services from CLECs, whereby the CLEC provides a local number which can be dialed to reach IDT Telecom's prepaid card platform.   The calls originating on a local number are routed to the CLEC's switch and then are sent to IDT Telecom's prepaid platform.[2]   IDT Telecom does not purchase switched access from Plaintiffs nor does IDT Telecom purchase switched access from CLECs for this service.   Thus, IDT Telecom has no direct dealings with Plaintiffs and no tariff, interconnection agreement or contract between IDT Telecom and Plaintiffs is applicable to the issues raised in the Complaint.

---

[2]  IDT Telecom has used various different means to bring calling card calls from the CLECs back to IDT Telecom's calling card platform   In some cases, these connections used Internet Protocol handoffs, in other cases they used time-division-multiplexing ("TDM") hand-offs, in some cases IDT Telecom leased circuits from long-haul providers that connected the CLEC's local switch to IDT Telecom's switch and in other cases, the CLECs with whom IDT Telecom contracted, delivered the traffic to IDT Telecom.

**DEFENDANTS' BRIEF IN SUPPORT OF**
**MOTION TO STAY OR DISMISS**                                                          **PAGE  4**

## C.    FCC Decisions and Pending FCC Proceedings

Over the last decade, the FCC has been engaged in establishing a fair and comprehensive inter-carrier compensation regime.[3]    As part of these efforts, the FCC has issued numerous decisions regarding the fees that carriers must pay each other, including switched access charges.[4]  Similarly, the FCC has issued numerous decisions regarding the fees and charges that prepaid calling card companies must pay.[5]  The June 30 FCC Order (discussed below), is just one of the many inter-related FCC orders and must be viewed in the context of the overall regulatory framework that is being establishing by the FCC.

### 1.    The June 30 FCC Order

Citing the June 30 FCC Order, the Complaint alleges that "all calling card providers must pay the tariff access charges for their customers' long distance calls."  (Compl. ¶ 29).  Plaintiffs grossly and inaccurately overstate the scope of the June 30 FCC Order.  By its own express terms, the June 30 FCC Order is limited only to two types of "enhanced calling cards" that are accessed by toll-free 8YY dialing:  "(1) menu-driven prepaid calling cards, and (2) prepaid calling cards that utilize IP [Internet Protocol] transport to deliver all or a portion of the call."  June 30 FCC Order at ¶ 10.  For example, with respect to the menu-driven prepaid calling card variant, the FCC noted that "[u]pon dialing the 8YY number, the cardholder is presented with the

---

[3]  *See, e.g.*, *Access Charge Reform*, CC Docket No. 96-262, First Report and Order, 12 FCC Rcd 15982 (1997); *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92, Notice of Proposed Rulemaking, 16 FCC Rcd 9610 (2001); *Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92, Further Notice of Proposed Rulemaking, 20 FCC Rcd 4685 (2005); *Comment Sought on Missoula Intercarrier Compensation Reform Plan*, CC Docket No. 01-92, Public Notice, 21 FCC Rcd 8524 (2006).

[4]  *See, e.g.*, *Access Charge Reform Order*; *Access Charge Reform, Reform of Access Charges Imposed by Competitive Local Exchange Carriers*, CC Docket No. 96-262, Seventh Report and Order, 16 FCC Rcd 9923 (2001); *Access Charge Reform, Reform of Access Charges Imposed by Competitive Local Exchange Carriers, Petition of Z-Tel Commc'ns Inc. For Temporary Waiver of Commission Rule 61.26(d) to Facilitate Deployment of Competitive Service in Certain Metropolitan Statistical Areas*, CC Docket No. 96-262, CCB/CPD File No. 01-19, Eighth Report and Order and Fifth Order on Reconsideration, 19 FCC Rcd 9108 (2004).

[5]  *See, e.g.*, *Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges*, WC Docket No. 02-361, Order, 19 FCC Rcd 7457 (2004); *Regulation of Prepaid Calling Card Services*, WC Docket No. 05-68, Declaratory Ruling and Report and Order, 21 FCC Rcd 7290 (2006).

option to make a telephone call or to access several types of information." *Id.* at ¶ 11. Likewise, with respect to the IP transport prepaid calling card variant, the FCC refers to cards that use 8YY dialing. *Id.* at ¶ 20 ("[O]ther than the use of 8YY dialing instead of 1+dialing, prepaid dialing cards [discussed in an earlier FCC Order]...."). In discussing "Access Charges," the FCC made clear that the access charges that were being discussed were those relating to calling card calls initiated by dialing 8YY numbers. *See id.* at 12, ¶ 28. Despite Plaintiffs' claims to the contrary, the June 30 FCC Order does not cover local access calls like the ones at issue in the Complaint.

## 2.    The Arizona Dialtone Request for Reconsideration

Recognizing the limitations of the June 30 FCC Order, Arizona Dialtone Inc, a CLEC providing local telephone service, petitioned the FCC for reconsideration. Among other things, Arizona Dialtone asked the FCC to "clarify the party responsible to pay access charges when local access is used to place a prepaid calling card call." Arizona Dialtone Inc. Petition for Reconsideration, WC Docket No. 05-68, at 1 (filed Aug. 31, 2006) (IDT Appendix 00023 to 00056). In response to the Arizona Dialtone Petition, the FCC established a pleading cycle inviting public comments on this question. Since then, other telecommunications companies have joined in Arizona Dialtone's request for clarification and have asked the FCC to clarify whether such access charges must be paid and if they are payable, who must make payment.[6] To date, the FCC has not resolved these open issues which are at the core of Plaintiffs' claims here.

---

[6] *See* May 28, 2009 letter from Cinco Telecom Corp to the FCC ("The Order does not discuss any restriction or prohibition regarding the use of local access numbers for prepaid calling cards, and leaves the issue of access charges in relation to calling card calls that use local access numbers unresolved. Arizona Dialtone, STi and others have explicitly asked the FCC to address this shortcoming.") (IDT Appendix 00096 to 00098). *See also* Verizon's October 12, 2006 Comments in Partial Support of Arizona Dialtone's Petition for Reconsideration, at 1 ("The Commission should clarify how [the June 30 FCC Order] applies when prepaid calling card providers set up their calling card platforms to be accessed by dialing a local telephone number.") (IDT Appendix 00068 to 00075); the October 12, 2006 Comments of Level 3 Communications LLC in Response to Arizona Dialtone's Petition for Reconsideration, at 10 ("[T]he Commission should clarify that access charge liability applies only to IXCs-not to intermediate CLECs providing DID service-even in the context of prepaid calling card services.") (IDT Appendix 00057 to 00067); Embarq's October 23, 2006 Reply Comments in Partial Support of Petition, at 2 ("[T]he [June 30 FCC Order] does not go far enough. It fails to provide the originating LECs with certainty regarding which party in

### III.    LEGAL ARGUMENT
### POINT I
### PLAINTIFFS' CLAIMS SHOULD BE STAYED PURSUANT
### TO THE DOCTRINE OF PRIMARY JURISDICTION

The Court should invoke the doctrine of primary jurisdiction and hold that Plaintiffs should not be permitted to proceed with this lawsuit while the exact same issues are already being considered by the FCC in ongoing proceedings.

The doctrine of primary jurisdiction is a judicially-created doctrine whereby a court of competent jurisdiction may stay an action pending resolution of some portion of the action by an administrative agency, here the FCC.  *See Penny*, 906 F.2d at 187; *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199, 201 (5th Cir.1988).  The doctrine is invoked when a claim requires the resolution of issues that are within the special competence of an administrative body.  *See Wagner*, 837 F.2d at 201.  In such a case, the judicial process may be suspended pending resolution of such issues by the administrative body.  *Id.*  Application of the doctrine is appropriate in cases such as this one where uniformity of administrative decisions is desirable or where there is a need for the specialized knowledge or expertise of the agency.  *Id.*  The doctrine is intended to ensure that the administrative agency is not bypassed in a matter that the legislature has committed to it.  *See Penny*, 906 F.2d at 187.

While there is no fixed formula for applying the doctrine of primary jurisdiction and each case must be examined individually to determine whether it would be aided by the doctrine, *id.*, the Fifth Circuit in *Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 69 F.3d 1304, 1311 (5th Cir. 1995), described the following three-part test for determining whether application of the primary jurisdiction doctrine is appropriate:

---

the chain of transactions (e.g., the calling card platform provider, the dialtone LEC, any intermediary LECs, the IXC) to bill for originating access, or the means to discover the identity of that party.") (IDT Appendix 00076 to 00081).

(1) the court has original jurisdiction over the claim before it; (2) the adjudication of that claim requires the resolution of predicate issues or the making of preliminary findings; and (3) the legislature has established a regulatory scheme whereby it has committed the resolution of those issues or the making of those findings to an administrative body.

Based on such an analysis, numerous courts have stayed cases involving complex telecommunications issues pending resolution of the issues by the FCC.  *See, e.g.*, *Southwestern Bell Tel. L.P. v. Global Crossing Ltd.*, No. 4:04-CV-1573(CEJ), 2008 WL 4938409 at *1-2 (E.D. Mo. Nov. 14, 2008) (upholding stay until FCC decides whether access service fees are owed to LECs) (IDT Appendix 00099 to 00100).  For example, in an action by a LEC against a long distance telephone provider seeking to collect interstate originating switched access charges, the court in *Frontier Telephone of Rochester, Inc. v. USA Datanet Corp.*, 386 F. Supp. 2d 144 (W.D.N.Y. 2005), held that the doctrine of primary jurisdiction warranted a stay of the action pending a determination by the FCC regarding the applicability of access charges to such a provider.  *Id.* at 151.  The court reached this decision because, *inter alia*, the FCC was already seeking comments on this issue and the question before the court involved technical and policy considerations, including use of local dialing pattern rather than toll, which were within the FCC's area of expertise and discretion.  *Id.* at 149-50.[7]  In addition, the Fifth Circuit has held that in cases involving the applicability or reasonableness of filed tariffs, courts should invoke the doctrine of primary jurisdiction where the appropriate administrative agency has particular expertise regarding the subject matter.[8]  The same rationale applies here.  This Court should

---

[7]  *See also AMC Liquidating Trust v. Sprint Communications Co., L.P.*, 295 F. Supp. 2d 650, 651-52 (M.D. La. 2003) (staying action relating to access charges based on the doctrine of primary jurisdiction and finding that "this issue is within the special competence of the FCC"); *AT&T Co. v. Delta Communications Corp.*, 114 F.R.D. 606, 609 (S.D. Miss. 1986) (claim regarding legality of interexchange channel tariffs stayed pending resolution of the issues by the FCC); *Sprint Spectrum L.P. v. AT&T Corp.*, 168 F. Supp. 2d 1095, 1101 (W.D. Mo. 2001) (staying action and referring matter to the FCC because the issue of whether Sprint may charge AT&T access fees for the use of the Sprint network and the amount of those charges are matters within the special expertise of the FCC).
[8]  *See Advance United Expressways v. Eastman Kodak Co.*, 965 F.2d 1347, 1352-53 (5th Cir. 1992) ("Matters in which the facts "raise technical or complex issues, regarding appropriate rates, that require the expert administration

exercise its discretion and refer this regulatory dispute about the application of switched access charges to locally-dialed pre-paid calling card traffic to the FCC, the administrative body made responsible for ensuring a comprehensive and fair inter-carrier compensation regime.

### A.    The Issues Raised by the Complaint Are Already Before the FCC

The FCC has been working on establishing a fair, reasonable and unified framework for inter-carrier compensation.  *See, e.g.*, FCC docket 01-92; 05-68.   Questions relating to the compensation that calling card providers may or may not have to pay other carriers are inextricably intertwined with the FCC's rate-setting efforts and should be left to the FCC to decide.  Indeed, the specific compensation issues raised by the Complaint in this case are before the FCC as a result of a petition filed with the FCC by Arizona Dialtone.

In its petition, Arizona Dialtone asks the FCC to clarify <u>which</u> party is responsible to pay access charges when local access is used to place a prepaid calling card call  *See Pleading Cycle Established for Arizona Dialtone Inc. Petition for Reconsideration and IDT Telecom, Inc. Petition for Clarification or, in the Alternative, for Reconsideration of Prepaid Calling Card Order*, FCC Public Notice (rel. Sept. 28, 2006).   After receiving this petition, the FCC established a pleading cycle inviting public comments.  A review of the docket shows that numerous parties have already submitted comments to the FCC and the record before the FCC is developed.  *See* Arizona Dialtone, Inc. Petition for Reconsideration, WC Docket No. 05-68, at 16 ("The record [before the FCC] is already developed sufficiently enough to permit the Commission to address these issues comprehensively through this petition.").  Based on these ongoing proceedings, the Court should permit the FCC to complete its consideration and resolve

---

of the Commission" are, along with reasonableness, within the primary jurisdiction of the Commission."); *Carter v. Am. Telephone & Telegraph Co.*, 365 F.2d 486 (5th Cir. 1966) (finding deference to FCC was appropriate in telecommunications case because of the risk of inconsistent adjudications).

these issues within the grater framework of its other carrier compensation-related decisions.[9]

## B.    The Issues Raised By the Complaint Have Not Been Resolved by the FCC

Despite allegations to the contrary in the Complaint (Compl. ¶ 30), the June 30 FCC Order has not resolved whether calling card providers are required to pay originating switched access charges to LECs when a LEC customer dials a local number, is connected with an intermediate carrier and then dials an inter-exchange call using the calling card provider's prepaid calling card.  This is so for the following reasons:

First, the June 30 FCC Order did not discuss the exchange of locally-dialed prepaid card traffic at all.  To the contrary, the June 30 FCC Order only addressed prepaid card traffic that is originated by means of inter-exchange carriers' 8YY toll-free services.[10]  Since the calls in that Order were 8YY calls, there was no question that they were inter-exchange calls.  The only question was whether they were interstate or intrastate. The FCC determined that they were intrastate when the calling and called parties were located in the same state.  But, as courts have found, the fact that "interstate" or "intrastate" jurisdiction determined by the end points of a communication is not relevant[11] to determining whether traffic is subject to access charges, which is at the crux of the Complaint in this case.[12]  Indeed, the absence of any discussion about the exchange of locally-dialed prepaid card traffic in the June 30 FCC Order is significant

---

[9]   *See, e.g.*, *American Trucking Ass'n v. ICC,* 682 F.2d 487, 491 (5th Cir.1982) (primary jurisdiction allows court faced with an issue requiring the special expertise of an agency to suspend proceedings pending referral of the issue to the agency for official position).

[10]   *See* June 30 FCC Order at ¶¶ 10-11, 20, 28.  For example, with respect to the menu-driven prepaid calling card variant, the FCC noted that "[u]pon dialing the 8YY number, the cardholder is presented with the option to make a telephone call or to access several types of information." Likewise, with respect to the IP transport prepaid calling card variant the FCC refers to cards that use 8YY dialing. "[O]ther than the use of 8YY dialing instead of 1+dialing, prepaid dialing cards....").

[11]   In general, where possible, FCC decisions require that the jurisdiction of traffic (i.e., whether it is "interstate" or "intrastate") be determined by the origination and termination points of the call.  *See, e.g.*, *NARUC v. FCC*, 746 F.2d 1492, 1499 (D.C. Cir. 1984).

[12]   For example, when the FCC relied on the end-to-end jurisdictional analysis to conclude that ISP-bound traffic is not "local," the D.C. Circuit reversed and remanded that decision on the ground that the FCC had failed to explain why the end-to-end jurisdictional analysis was relevant to determining which inter-carrier compensation mechanism (access or non-access) would apply.  *See Bell Atlantic v. FCC*, 206 F.3d 1, 5 (D.C Cir. 2000).

because courts have refused to read issues into FCC orders that were not before the FCC at the time an order was crafted. *See, e.g.*, *Frontier Tel. of Rochester, Inc.*, 386 F. Supp. 2d at 150 (refusing to expand FCC decision to different dialing pattern).

Second, the June 30 FCC Order did not resolve the issues raised by the Complaint for yet another reason. The locally dialed calls originated by Plaintiffs' customers are not subject to access charges but rather to reciprocal compensation under Section 251(b)(5) because, as alleged in the Complaint, Plaintiffs are handing off the call to another LEC (or CLEC) and not to a calling card provider such as IDT Telecom. (Compl. ¶ 33.) Indeed, IDT Telecom's telecommunications agreements dealing with the hand-off of locally-made prepaid calling card calls are with third party CLECs, not with Plaintiffs.

Section 251(b)(5) of the FCC Act requires that LECs enter into reciprocal compensation arrangements to compensate each other for the transport and termination of telecommunication services. Section 251(b)(5) applies to all telecommunications traffic, unless that traffic is excluded (or "carved-out") by Section 251(g).[13] The appellate court's decision in *WorldCom, Inc. v. FCC*, 288 F.3d 429, 432-34 (D.C. Cir. 2002), demonstrates why the compensation owed to Plaintiffs is reciprocal compensation and not access charges. In *WorldCom*, the court rejected the FCC's reliance on the carve-outs of Section 251(g) to classify Internet Service Provider- ("ISP-") bound traffic. The FCC had concluded that ISP-bound traffic fell within the scope of Section 251(g) and established a new hybrid compensation scheme for such traffic. The court in *WorldCom* rejected this analysis and concluded that Section 251(g) provided no basis for the FCC's determination that ISP bound traffic was excluded from Section 251(b)(5). The court

---

[13]    Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Intercarrier Compensation for ISP-Bound Traffic, CC Docket Nos. 96-98, 99-68, *Order on Remand and Report and Order*, 16 FCC Rcd 9151, 9165-66 (¶¶ 30-39) (2001), remanded, *WorldCom v. FCC*, 288 F.3d 429, 431-34 (D.C. Cir. 2002), *cert. denied,* 538 U.S. 1012 (2003).

found that Section 251(g) permits only "continued enforcement" of pre-1996 Act requirements, rather than conferring independent authority on the FCC to create new inter-carrier compensation rules inconsistent with Section 251(b)(5). *See WorldCom*, 288 F.3d at 432-34. In other words, the "access" traffic described in Section 251(g) is limited to traffic exchange obligations that existed as of February 8, 1996.

The court in *WorldCom* also noted that Section 251(g) only governs service provided to inter-exchange carriers and information service providers, <u>not</u> services that LECs provide to other LECs, such as those services LECs provide each other to originate and deliver a locally-dialed call to an Internet Service Provider. The court recognized that "LEC's services to other LECs, even if en route to an ISP, are not 'to' either an IXC or to an ISP." *Id.* at 434-35. Thus, the court reasoned that because "there had been no pre-Act obligation relating to intercarrier compensation for ISP-bound traffic," the FCC could not use Section 251(g) to create a new and different inter-carrier compensation regime, such as the one that Plaintiffs seek to impose here. *Id.* at 432-33. Similarly, there was no pre-Act obligation relating to inter-carrier compensation for the exchange of locally-dialed prepaid card traffic between two competing LECs (here, Plaintiffs and the CLEC). Moreover, locally-dialed prepaid card traffic cannot be subject to the Section 251(b) pre-Act carve-out because in exchanging locally-dialed prepaid card traffic, a LEC is providing service to another LEC, not to an IXC or service provider. Accordingly, locally dialed prepaid card traffic falls squarely within Section 251(b)(5)'s reciprocal compensation regime and to the extent that Plaintiffs are claiming something different, that argument should be made, in the first instance, to the FCC, not to this Court.

### C.    <u>This Dispute Should Be Resolved On An Industry-wide Basis</u>

The most appropriate manner for this dispute to be resolved is through an industry-wide decision by the FCC. Otherwise, the level playing field that the FCC wishes to establish in the

calling card industry will be dramatically altered. *See* June 30 FCC Order at 4, ¶ 8.[14]  As discussed above, the FCC already has been asked to clarify whether prepaid calling card providers owe originating switched access charges to LECs (like Plaintiffs), whose customers place a local call to a CLEC and then have their calls forwarded by the CLEC to a platform operated by a prepaid calling card service provider (such as IDT Telecom).  It is critically important that the same rules regarding the obligation to pay originating switched access charges apply across-the board to all prepaid calling card providers.  Indeed, it would be highly disruptive to the calling-card industry to have different rules applied in different judicial districts, even on a short-term basis.  This is so for several reasons.

First, the prepaid calling card industry is a highly competitive and price sensitive industry which primarily provides telecommunications services to calling card users who are extremely cost-conscious.  The FCC has articulated the need for a level playing field and stability in the prepaid calling card industry.  *See* June 30 FCC Order at ¶¶ 4, 22.  Likewise, in support of its petition for declaratory relief from the FCC in the proceeding leading to the June 30 FCC Order, AT&T warned the FCC that "piecemeal adjudications" relating to prepaid calling cards should be avoided and that "the public interest would be best served" by considering calling card issues in a "more comprehensive manner."  AT&T Emergency Petition For Immediate Interim Relief, WC Docket No 05-68, at 1 (filed May 3, 2005) (IDT Appendix 00001 to 00022).

The same rationale applies here.  A decision by this Court in favor of Plaintiffs (which IDT Telecom believes is not warranted under the facts or the law) would impose on IDT Telecom an expense that other calling card companies would either never face or would face at different times.  Being at such a price disadvantage to its competitors, even for a short period of

---

[14]  *See also* AT&T Emergency Petition For Immediate Interim Relief, WC Docket No 05-68, at 15 (filed May 3, 2005) (stating that there is a "critical need for a level playing field" in the calling card industry while regulatory proceedings are pending).

time, may cause IDT Telecom to lose significant market share, something that IDT Telecom may not ever be able to recoup.[15]  Indeed, piecemeal litigation would wreck havoc on the calling card industry by allowing small calling card companies or new industry entrants -- who would not be required to include access fee payments in calculating their calling card rates -- to grab market share from companies like IDT Telecom who have invested hundreds of millions of dollars in their brands and networks and are attempting to compete on a level playing field.  *Cf.* AT&T Emergency Petition For Immediate Interim Relief, WC Docket No 05-68, at 4 (filed May 3, 2005) (complaining about "regulatory uncertainties and asymmetries" in the prepaid calling card market "where very slight cost differences have immense competitive significance").  Moreover, serial (or even worse, sporadic) lawsuits filed in different courts, in different jurisdictions, at different times against some but not all of the calling card companies may lead to inconsistent rulings, thereby advantaging some but disadvantaging other calling card companies.  Assuming that Plaintiffs would be able to establish the applicability of switched access charges to calling card services utilizing local access numbers, a judgment in this case would render IDT Telecom the only calling card provider subject to such a requirement.  Thus, the cost of IDT Telecom calling card services would increase resulting in lost market share which may never be recouped.  Accordingly, an industry-wide resolution of these issues by the FCC is required so as not to unfairly disadvantage IDT Telecom.

Second, even though IDT Telecom and Plaintiffs are the only entities before this Court, they are not the only entities which may be impacted by a decision on the issues raised by the Complaint.  Consumers and numerous other LECs and CLECs around the country also may be impacted to differing degrees.  For example, depending on how this Court rules, some CLECs, in

---

[15]  *See Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (finding likelihood of price erosion and loss of market position are evidence of irreparable harm); *MyVitaNet.com v. Kowalski*, No. 2:08-cv-48, 2008 WL 203008, at *6 (S.D. Ohio Jan. 22, 2008) (finding, *inter alia*, the loss of market share and fair competition to constitute a threat of irreparable harm) (IDT Appendix 00119 to 00124).

some states, may stop offering local access numbers to prepaid calling card providers thereby making them unavailable to calling card consumers in those states who have become used to them. *See* May 28, 2009 letter from Orbitel to FCC at 1 ("Local access numbers are commonly used by customers to connect to the prepaid calling card platforms."). Moreover, this Court's decision may impact the types of agreements that calling card companies enter into with some LECs and CLECs. Indeed, this may be the true motivation of Plaintiffs' lawsuit. In prior correspondence with IDT Telecom, counsel for AT&T (writing on behalf of Plaintiffs and other AT&T subsidiaries) have claimed that the only way to provide local access numbers for prepaid calling cards is for the calling card companies to employ Feature Group A services – services which are only available from originating LECs (like Plaintiffs). *See* July 21, 2008 letter from Plaintiffs' counsel to IDT Telecom at 2 (demanding that IDT Telecom "immediately begin to route and deliver such traffic over appropriate Feature Group trunks"). This would mean that prepaid calling card providers would be unable to acquire local access numbers from CLECs, thereby directly impacting the CLECs and prepaid calling card companies in contravention of the Telecommunications Act's objective of promoting competition.[16]

## POINT II
### PLAINTIFFS' CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF COULD BE GRANTED

In the alternative, if this Court decides not to invoke the doctrine of primary jurisdiction and stay this action pending resolution of the Complaint's regulatory issues by the FCC, the

---

[16] Plaintiffs' desire to construct a market for its Feature Group A services through litigation is demonstrated in its comments submitted to the FCC in connection with the Arizona Dialtone proceedings. AT&T, Inc., Reply Comments, FCC Docket 05-68 (submitted Oct. 23, 2006) (IDT Appendix 00082 to 00095). There, AT&T asserted that rather than purchase local access numbers from CLECs, calling card providers should be compelled to purchase its "Feature Group A" products as a substitute. *See* AT&T Reply, at 7. Indeed, in its reply comments, AT&T went so far as to say the failure to purchase Feature Group A services would constitute a violation of FCC orders. *Id.* at 8

Court should dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(6).[17]

### A.    12(b)(6) Standard

The Supreme Court has held that, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009).  With respect to the "plausibility" standard, the Court in *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. The Court in *Iqbal* made clear that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id*.  Moreover, in deciding a motion to dismiss, a court is not required to accept conclusory allegations or unwarranted deductions of fact as true.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Arguijo v. Owens*, No. 4:08-CV-140-A, 2008 WL 2388903, at *1 (N.D. Tex. June 9, 2008) (IDT Appendix 00100 to 00104).[18]

### B.    The Complaint Fails To State Claims For Breach of Tariffs

Without citing which tariffs and which provisions of those tariffs are applicable to their claims, Plaintiffs allege that IDT Telecom breached Plaintiffs' tariffs, by _not_ purchasing local number services from Plaintiffs and instead purchasing those services from third parties.

---

[17]  *See, e.g.*, *McMickle v. Arkansas Tel. Co.*, No. 4:08-cv-324 SWW, 2009 WL 928895, at *4 (E.D. Ark. Apr. 3 2009) (dismissing claim under the filed rate doctrine because, if successful, plaintiff's claim would have the effect of changing the filed tariff) (IDT Appendix 00125 to 00130); *Industrial Leasing Corp. v. GTE Northwest Inc.*, 818 F. Supp. 1372, 1374 (D. Or. 1992) (dismissing claims after interpreting tariff language).

[18]  In *Iqbal*, the Supreme Court stated that the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal* 129 S. Ct. at 1949-50.

Nevertheless, Plaintiffs allege that IDT Telecom should pay switched access fees to Plaintiffs. These causes of action should be dismissed for the following reasons.

### 1. Plaintiffs Fail To Identify Which Tariffs And Which Provisions of Those Tariffs IDT Telecom Allegedly Breached

The jurisdictional and substantive predicate for the claims in the Complaint is that IDT Telecom violated certain <u>unidentified</u> provisions of certain <u>unidentified</u> federal and state tariffs that Plaintiffs allege that they have on file with the FCC and the relevant state commissions by not paying them "switched access fees." (Compl. ¶¶ 38, 41, 47, 50). The Complaint only alleges that (i) Plaintiffs delivered the origination traffic at issue to other independent third-parties, namely the CLECs; and (ii) the CLECs, in turn, delivered the traffic to IDT Telecom's calling card platform. These facts do not even remotely support the conclusion that IDT Telecom accepted (expressly, constructively or in any other way) Plaintiffs' tariff-based offer and that the tariffs were breached by IDT Telecom. In short, Plaintiffs' claims against IDT Telecom are precisely the brand of pleading courts are free to ignore because they are legal conclusions cast in the form of factual allegations. *See Iqbal*, 129 S. Ct. at 1949. Indeed, courts have dismissed claims for breach of contract where the complaint fails to specify which provisions of an agreement the defendant allegedly breached. *See, e.g.*, *Southwest Louisiana Healthcare Sys. v. MBIA Ins. Co.*, No. 05-1299, 2008 WL 5155752, at *6 (W.D. La. Dec. 8, 2008) (IDT Appendix 00105 to 00115); *Wolf v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358-59 (S.D.N.Y. 2001). This Court should do the same. At minimum, this Court should order Plaintiffs to file an amended pleading specifying which provisions of which tariffs IDT Telecom allegedly breached. *See, e.g.*, *In re Worldcom, Inc. Secs. Litig.*, No. 02 Civ.3288(DLC), 2006 WL 751382, at *3 (S.D.N.Y. Mar. 24, 2006) (IDT Appendix 00116 to 00118). Such relief is appropriate in cases such as this one where there are numerous plaintiffs each with their own very voluminous

Federal and State tariffs which may have undergone numerous revisions.  IDT Telecom should not be required to guess which tariffs and which provisions of those tariffs Plaintiffs are relying on in alleging Counts I and II.[19]

The Complaint's failure to identify which provisions of the federal and state tariffs IDT Telecom allegedly breached appears not to have been an oversight by Plaintiffs.  A review of some of Plaintiffs' tariffs reveals that those tariffs apply only to "customers."[20]  In turn, "Customer" is defined in many of Plaintiffs' tariffs as "any individual, partnership, association, joint-stock company, trust, corporation or governmental entity or any other entity <u>which subscribes to the services</u> offered under this tariff, including both Interexchange Carriers (ICs) and End Users."  Southwestern Bell Telephone Company, Tariff FCC No. 73, § 2.7 (rev. eff. Sept. 30, 2009) (emphasis added).[21]  Nowhere do Plaintiffs allege that IDT Telecom subscribed to Plaintiffs' services with respect to any of the traffic at issue here.  Nor do Plaintiffs allege that

---

[19] *See Red Shield Ins. Co. v. Barnhill Marina & Boatyard, Inc.*, No. C 08-02900 WHA, 2008 WL 3271052, at *3 (N.D. Cal. Aug. 7, 2008) (granting motion for a more definite statement because (i) plaintiff's breach of contract allegations were vague, and (ii) plaintiff failed to attach a copy of the contract to the complaint) (IDT Appendix 00131 to 00133).

[20] *See, e.g.*, Southwestern Bell's Base Tariff, FCC No. 73, § 1.1 (rev. eff. Sept. 30, 2009) ("[t]his tariff contains regulations, rates and charges applicable to the provision of Carrier Common Line, End User Access, Prescribed Interexchange Carrier Charge, Federal Universal Service Fund (FUSF) Surcharge, Switched Access and Special Access Services, and other miscellaneous services, hereinafter referred to collectively as service(s), <u>provided to customers</u> by the Southwestern Bell Telephone Company . . ." (Emphasis added); Bellsouth's Base Tariff, FCC No. 1, § 1.1 (rev. eff. Sept. 30, 2009) ("this tariff contains regulations, rates and charges applicable to the provision of Carrier Common Line, End User Access, BellSouth SWA and Special Access … Services, BellSouth Virtual Expanded Interconnection Service, Lifeline Assistance, Federal Universal Service Fund (FUSF) Surcharge and other miscellaneous services, hereinafter referred to collectively as service(s), provided by the BellSouth Telecommunications, Inc., hereinafter referred to as the Telephone Company, <u>to customers</u>.") (Emphasis added).

[21] Many of Plaintiffs' other interstate and intrastate access tariffs contain either the identical or a comparable definition.  *See, e.g.*, BellSouth Telecommunications, Inc. Tariff FCC No. 1, § 2.6 (rev. eff. Sept. 30, 2009) ("any individual, partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity <u>which subscribes to the services offered under this tariff</u>, including both Interexchange Carriers (ICs) and End Users) (emphasis added); Southern New England Telephone Company, Tariff FCC No. 39 § 2.13 (rev. eff. Sept. 30, 2009) (same);  Pacific Bell Telephone Company Tariff  FCC No. 1 § 2.6 (rev. eff. Sept. 30, 2009) ("any individual, partnership, association, joint-stock company, trust corporation, or governmental entity or any other entity <u>which subscribes to the Services offered under this tariff</u>, including Interexchange Carrier (IC's), End Users, and Collocators) (emphasis added).  Tariffs filed by LECs with the FCC are available via the FCC's website, at http://svartifoss2.fcc.gov/cgi-bin/ws.exe/prod/ccb/etfs/webpublic/selectlec.hts

they ever billed IDT Telecom for such services.[22]  Thus, because IDT Telecom did not subscribe with Plaintiffs to be one of their customers, Plaintiffs' causes of action fail to state breach of tariff claims against IDT Telecom.  The Communications Act prohibits Plaintiffs, like other carriers, from seeking to collect charges in a manner that is inconsistent with the filed tariffs. *See* 47 U.S.C. § 203(c) (2000).[23]  That principle is no less controlling here.  Because Plaintiffs have neither identified the tariffs they claim govern the parties' relationship nor alleged facts sufficient to show those tariffs apply to IDT Telecom, the Court should dismiss Counts I and II.

### 2.    There Was No "Offer and Acceptance" Resulting in a Contract

To be bound by the tariffs, IDT Telecom must have accepted Plaintiffs' tariff-based offers to provide services to IDT Telecom.  Plaintiffs do not allege that IDT Telecom ever accepted Plaintiffs' offers, and IDT Telecom never did so.  Under the most fundamental precepts of contract law, no tariff-based contract exists between Plaintiffs and IDT Telecom.  *See Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. 1988) (essential elements of a valid contract include offer, acceptance, and bargained for consideration, citing Restatement of Contracts 2d § 17 (1981)).[24]  Obviously, no "breach" of a contract is possible if no contract was

---

[22] This is important because to the extent there is a finding that Plaintiffs' tariffs apply to IDT Telecom, many of those tariffs have billing requirements that Plaintiffs have failed to comply with, such as:  (i) to bill for outstanding charges on a "current basis," and (ii) to comply with specific dispute resolution mechanisms.  Indeed, the FCC has warned that failure to bill charges on a current basis may be "an unjust and unreasonable practice" under the Communications Act.  *See In the Matter of American Network, Inc. Petition for Declaratory Ruling Concerning Backbilling of Access Charges*, 4 FCC Rcd. 550, 552 (1989).

[23] *See also MCI Worldcom Network Servcs, Inc. v. Paetec Communications, Inc.*, No. 04-1479, slip op. at 11-12 (E.D. Va. Aug. 31, 2005) (finding that allowing the defendant to retain originating access charges would violate the filed tariff doctrine and stating that"[t]he Supreme Court has further stated that the rates and services contained in a carrier's tariff are the only lawful charges that can be applied to a customer, and that deviation from the tariff is not permitted under any circumstances"), *aff'd mem. op.,* No. 06-1013 (4th Cir. Oct. 25, 2006).

[24] *See also  Coffel v. Stryker Corp.,* 284 F.3d 625, 640 n.17 (5th Cir. 2002) (under Texas law, parties form binding contract when following elements are present: offer, acceptance in strict compliance with terms of offer, meeting of minds, each party's consent to terms, and execution and delivery of contract with intent that it be mutual and binding); *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.—San Antonio 1997, no pet.) (same); *Meyer v. Benko*, 55 Cal. App. 3d 937, 942 (Cal. Ct. App. 1976) (every contract requires the mutual assent or consent of the parties, citing Cal. Civ. Code, §§ 1550, 1565).

formed.  Accordingly, the Court should dismiss Counts I and II because there are no contracts between Plaintiffs and IDT Telecom with respect to the traffic at issue in this case.[25]

### 3.    No FCC Regulation or Order Binds IDT Telecom To The Tariffs, Compels IDT Telecom To Use The Services Under Tariff or Varies the Express Terms of the Tariffs

Realizing the deficiencies of their tariff-based claims, Plaintiffs contend that IDT Telecom is liable under Plaintiffs' tariffs for services they neither ordered nor received from Plaintiffs based on language contained in the June 30 FCC Order that discussed different issues pertaining to calling cards.  As explained above, such a theory is groundless, draws legal conclusions and cannot substitute for the Complaint's failure to plead the requisite facts.  *See Iqbal*, 129 S. Ct. 1949.  The Court must reject Plaintiffs' contrived view that the June 30 FCC Order established a new or different relationship between IDT Telecom and Plaintiffs.[26]

Even if the Court chose to go beyond the plain language of Plaintiffs' yet-to-be identified tariffs to examine the language and effect of the June 30 FCC Order, it will find no support for Plaintiffs' assertion that the FCC "decided that 'all' prepaid calling card providers must pay the applicable interstate or intrastate access charges on long distance calls made via their platforms." (Compl. ¶ 30).  As explained above, the Complaint's reliance on the June 30 FCC Order is misplaced because that Order in no way alters the substance or applicability of Plaintiffs' filed tariffs and it does not even apply to locally-dialed calls at issue in the Complaint.  The relevant provisions of Plaintiffs' tariffs have been in effect for years.  Nothing in the June 30 FCC Order

---

[25]  Given that Plaintiffs appear to allege violations of tariffs and state law claims applicable in numerous states, the law of each of these states would govern.  The Complaint alleges that Plaintiffs do business in twenty-two states. *See* Compl. ¶¶ 3-12. For the sake of simplicity, and because the principles articulated in the text are so fundamental that they cannot reasonably be challenged by Plaintiffs, IDT Telecom cites to precedents from representative jurisdictions in which Plaintiffs are alleging that contracts were formed and the violations occurred.

[26]  *See 3 Rivers Tel. Coop., Inc. v. U.S. West Communications, Inc.,* 45 Fed. Appx. 698, 699, 2002 U.S. App. LEXIS 18196, at *3 (9th Cir. 2002) (where tariffs are "exclusive source" of obligation between plaintiff carriers and their customers, it was reversible error to "analyz[e] the parties' obligations under FCC interpretations or the Telecommunications Act of 1996 . . . without interpreting the tariffs themselves").

altered the meaning of these tariff provisions.[27]  To the extent that Plaintiffs claim otherwise, resolution of the meaning and scope of the June 30 FCC Order should be left to the FCC.[28]

The Complaint does not cite any other rules or regulations supporting its claims that IDT Telecom owes Plaintiffs switched access fees.  To the contrary, carriers may not establish regimes that seek to hold third parties liable for access services that they neither ordered nor wanted.[29]  Thus, Plaintiffs are simply wrong when they assert that the June 30 FCC Order resulted in imposing liability on calling card providers who have calls handed-off to them by third-parties.  Given that the June 30 FCC Order could not and did not vary filed tariffs, and that the Complaint cites no other rule or regulation binding IDT Telecom to those tariffs or otherwise obligates IDT Telecom to order or use services under those tariffs, the theories underlying Counts I and II are without foundation and should be dismissed.

### C.    The Complaint Fails To State Claims For Unjust Enrichment

Plaintiffs claim that IDT Telecom unjustly enriched itself because it accepted and retained the benefit of Plaintiffs' call-origination services.  (Compl. ¶ 56).  The allegations of the Complaint, however, fail to make out a claim for unjust enrichment and should be dismissed.

---

[27]   The FCC has interpreted not only its access charge rules but also carriers' interstate tariffs in a manner such that they apply only to <u>customers</u> who subscribe to access services.  For example, the FCC has described its Part 69 (access charge) rules as follows: "Access services are to be made available to *any customer that* <u>chooses to subscribe</u> to the services for interstate purposes."  Policies and Rules Concerning Local Exchange Carrier Validation and Billing Information for Joint Use Calling Cards, Mem. Op. and Order on Reconsideration, 12 FCC Rcd 1632, 1642 (1997) (emphasis added).

[28]   *See, e.g.*, *Davel Communications, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1089 (9th Cir. 2006) (finding that the FCC was in best position to resolve dispute about the scope of its order and stating:  "We agree that the primary jurisdiction doctrine requires referral of the threshold issue of the scope of the Waiver Order.  Both this court and the Supreme Court have held that the interpretation of an agency order issued pursuant to the agency's congressionally granted regulatory authority falls within the agency's primary jurisdiction where the order reflects policy concerns or issues requiring uniform resolution.").

[29]   *See, e.g.*, *Halprin, Temple, Goodman & Sugrue v. MCI Telecomms. Co.*, Order on Reconsideration, 14 FCC Rcd 21092, 21096-98 (1999) (reaffirming finding that an MCI tariff that sought to impose certain "non-subscriber" charges was ambiguous and unreasonable); US West, Tariff FCC Nos. 3 and 5, Trans. No. 629, Order, 10 FCC Rcd 13708 (1995) (rejecting tariff revisions that would have required Centrex resellers to pay switched access charges in lieu of less expensive special access charges).

As a threshold matter, because a filed tariff is the exclusive source of the terms and conditions by which a carrier provides the services covered by the tariff, the tariff necessary displaces state law claims for adjudicating those terms and conditions. *See A.S.I. Worldwide Communications Corp. v. WorldCom*, 115 F. Supp. 2d 201, 210-12 (D.N.H. 2000). Thus, Plaintiffs' unjust enrichment claim, which requires the Court to determine the parties' rights created by the filed tariffs, must be dismissed. *See id.* at 211-12.[30]

Moreover, under hornbook principles of law, restitution based on a defendant's unjust enrichment may be made only when there is: (i) a benefit conferred on the defendant by the plaintiff; (ii) an appreciation or knowledge by the defendant of the benefit; and (iii) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value to plaintiff. *See* 26 Williston on Contracts § 68:5, p. 62 (4th ed. 2003). These fundamental elements are no different in the states whose laws may apply to these claims.[31] Thus, Plaintiffs' unjust enrichment claim fails because: (i) Plaintiffs did not provide services to IDT Telecom, and so it conferred no benefit on IDT Telecom; (ii) Plaintiffs already have been compensated for their services and thus, suffered no damages, and (iii) it is not unjust to permit IDT Telecom to contract with alternative providers to obtain local numbers.

---

[30] *See also Pfeil v. Sprint Nextel Corp.*, 504 F. Supp. 2d 1273, 1276 (N.D. Fla. 2007) (finding state law claims barred by the filed rate doctrine), *aff'd*, 284 Fed. Appx. 640, at *3 (11th Cir. 2008); *Staton Holdings, Inc. v. MCI Worldcom Communications, Inc.*, No. Civ.A. 399CV2876D, 2001 WL 1041796, at *4 (N.D. Tex. Sept. 4, 2001) (same) (IDT Appendix 00134 to 00139).

[31] *See Erlson v. Vee-Jay Cement Contracting Co.*, 728 S.W.2d 711, 713 (Mo. Ct. App. 1987) (the essential elements of unjust enrichment are: "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable"); *Hirsch v. Bank of America*, 107 Cal. App. 4th 708, 717 (Cal. Ct. App. 2003) (an unjust enrichment claim requires "receipt of a benefit and unjust retention of the benefit at the expense of another"); *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (recovery for unjust enrichment permitted where benefit obtained from another by fraud, duress, or taking of undue advantage).

First, Plaintiffs do not and cannot allege that they conferred a benefit on IDT Telecom when IDT Telecom contracted to purchase local number service from providers other than Plaintiffs. Indeed, the essence of Plaintiffs' claims is that IDT Telecom did not use Plaintiffs' services, but instead used someone else's services to hand-off local calls to its calling card platform. Because, as the Complaint concedes, IDT Telecom did not have a direct access to Plaintiffs' services, Plaintiffs did not provide any benefit to IDT Telecom. Nor can it be argued that Plaintiffs conferred a benefit on IDT Telecom because Plaintiffs originated calls that were sent to IDT Telecom by a third party (here, the third party CLECs).

Plaintiffs have conferred no benefit on IDT Telecom because they simply are not entitled to any payment from IDT Telecom. *See, e.g., Hirsch*, 107 Cal. App. 4th at 717 ("[F]or any of these [unjust enrichment and restitution] claims to fly, appellants must have been deprived of something to which they were entitled. Therein lies the problem."). As explained above, because Plaintiffs have not shown that their tariffs apply to IDT Telecom, Plaintiffs have no right to payment from IDT Telecom. Accordingly, their unjust enrichment claim against IDT Telecom must fail. *Cf. American Civil Liberties Union v. Miller*, 803 S.W.2d 592, 595 (Mo. 1991) (unjust enrichment claim failed where plaintiff had no right to fees at issue and, therefore, it conferred no benefit on defendant).

Second, Plaintiffs cannot state a claim for unjust enrichment against IDT Telecom because they have already been compensated for their services in originating or transiting these locally-dialed calls. As local exchange carriers, Plaintiffs receive compensation for their services in originating these locally-dialed calls from the local rates paid to Plaintiffs by their customers.[32] If a third party local exchange carrier's customer originates the call, Plaintiffs

---

[32] 47 C.F.R. § 51.703(b); Developing a Unified Intercarrier Compensation Regime, CC Docket No. 01-92, Notice of Proposed Rulemaking, 16 FCC Rcd 9610, ¶ 112 (2001) ("Our current reciprocal compensation rules preclude an

receive compensation from the originating carrier for the transiting services they provide through interconnection agreements filed with the states and/or commercial transit agreements filed with the FCC.[33]  Because Plaintiffs already have received value for the benefit they purportedly have conferred on IDT Telecom, Plaintiffs cannot show that they have been damaged in a manner that justice would require them to obtain restitution from IDT Telecom.  *See, e.g.*, *Van Zanen v. Qwest Wireless, L.L.C.*, 522 F.3d 1127, 1130 (10th Cir. 2008) (dismissing unjust enrichment claim because plaintiff received value for the benefit bestowed on defendant); *Ziegler v. Findlay Indus., Inc.*, 464 F. Supp. 2d 733, 739 (N.D. Ohio 2006) (same).

 <u>Third</u>, even if this Court believes that Plaintiffs conferred a benefit on IDT Telecom because its customers originated local calls that were handed-off to IDT Telecom by independent third parties, the Complaint fails to establish that it would be unjust for IDT Telecom to retain that benefit.  "Unjust" enrichment occurs when a person has "wrongfully secured" a benefit or has received one which it would be "unconscionable to retain."  *See Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied).  In this case, IDT Telecom has not acted "wrongfully."  It neither has violated any law nor has contravened any other legal obligation in entering into contracts with third parties which hand off calls to IDT Telecom's calling card platform.  As explained above, neither the tariffs nor any

---

ILEC from charging carriers for local traffic that originates on the ILEC's network.").  *See also* TSR Wireless, LLC. v. U S West Communications, Inc., Memorandum Opinion and Order, 15 FCC Rcd. 11166, ¶ 34 (rel. June 21, 2000), *aff'd, Qwest Corp. v. FCC*, 252 F.3d 462 (D.C. Cir. 2001) ("Under the Commission's regulations, the cost of the facilities used to deliver this traffic is the originating carrier's responsibility, because these facilities are part of the originating carrier's network.  The originating carrier recovers the costs of these facilities through the rates it charges its own customers for making calls. This regime represents 'rules of the road' under which all carriers operate, and which make it possible for one company's customer to call any other customer even if that customer is served by another telephone company."); Petition of WorldCom, Inc., et al., Pursuant to § 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Comm'n, Memorandum Opinion and Order, Wireline Comp. Bur., 17 FCC Rcd 27039, ¶ 66 (2002)("all LECs are obligated to bear the cost of delivering traffic originating on their networks to interconnecting LECs' networks for termination").

[33]  *See* Developing a Unified Intercarrier Compensation Regime, CC Docket No. 01-92, Further Notice of Proposed Rulemaking, 20 FCC Rcd 4685, ¶ 120 & n. 342(2005) ("the intermediary (transiting) carrier then charges a fee for use of its services" pursuant to interconnection or other agreements).

regulation requires IDT Telecom to use Plaintiffs' local numbers or pay Plaintiffs switched access fees.

Moreover, as the Complaint alleges, the CLECs are the only entities that are in direct contact with Plaintiffs. (Compl. ¶ 27). Plaintiffs cannot invoke the doctrine of unjust enrichment to require IDT Telecom to compensate Plaintiffs for services that IDT Telecom does not receive from Plaintiffs. *See Heldenfels Bros., Inc.*, 832 S.W.2d at 42 (unjust enrichment is not proper remedy merely because it might appear expedient or generally fair); *Farmers New World Life Insurance Co. v. Jolley*, 747 S.W.2d 704, 705-06 (Mo. Ct. App. 1988) (mere receipt of benefits by a party is not a basis for restitution unless there is an element of injustice involved). Indeed, given the clear absence of any violation of law by IDT Telecom, nothing is alleged in the Complaint that is so "unconscionable" or otherwise so offends equity for this Court to conclude that IDT Telecom has been or is being unjustly enriched. *See Villarreal*, 136 S.W.3d at 270 (absent trespass, defendants did not "wrongfully secure a benefit" and they did not receive one that it would be "unconscionable to retain"). Thus, absent an identifiable benefit conferred by Plaintiffs on IDT Telecom, absent any injury and absent any legal theory or facts establishing unjust circumstances, the Complaint fails to state an unjust enrichment claim.

## IV.    CONCLUSION

For all of the foregoing reasons, IDT Telecom respectfully requests that the Court stay this action based on the doctrine of primary jurisdiction pending resolution by the FCC of the regulatory issues raised by the Complaint, or alternatively, dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(6).

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**


By:  /s/ Tammy S. Wood
       Tammy S. Wood
       State Bar No. 00788713

3232 McKinney Avenue, Suite 1400
Dallas, Texas  75204-2429
Telephone:  (214) 740-1400
Facsimile:  (214) 740-1499
tammyw@bellnunnally.com

**ATTORNEYS FOR DEFENDANTS
IDT TELECOM, INC. AND
ENTRIX TELECOM, INC.**


## CERTIFICATE OF SERVICE

On the 9th day of October, 2009, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Texas using the electronic filing system of the Court.  I hereby certify that I served a true and correct copy of the foregoing document on all counsel of record for Plaintiffs electronically or in another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

                      /s/ Tammy S. Wood

537747_1.DOC