**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SOUTHWESTERN BELL TELEPHONE COMPANY, *et al.* | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 3-09-cv-01268-P |
| IDT TELECOM, INC., ENTRIX TELECOM INC., and JOHN DOES 1-10, | ) ) ) ) | |
| Defendants. | ) | |

**REPLY BRIEF IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**(REDACTED)**

Richard M. Parr, Bar No. 15534250
Timothy A. Whitley, Bar No. 00797660
AT&T Services, Inc.
208 S. Akard
Suite 2900
Dallas, Texas 75202
Telephone (214) 757-3386
Facsimile  (214) 748-1660

Theodore A. Livingston (*pro hac vice*)
Demetrios G. Metropoulos (*pro hac vice*)
Michael T. Sullivan (*pro hac vice*)
Robert E. Entwisle (*pro hac vice*)
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone (312) 782-0600
Facsimile (312)  701-7711

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.    There Is No Genuine Dispute As To Any Material Fact Regarding IDT's
Liability ................................................................................................................ 2

    A.    IDT Is "Accountable For Access Charges" Under This Court's
Test ........................................................................................................... 3

        1.    IDT Ignores The "Clear Path" Charted By This Court And
The FCC........................................................................................ 3

        2.    There Is No Genuine Dispute That IDT Is A Long-Distance
Provider........................................................................................ 5

    B.    The FCC Conclusively Decided The Issue Presented Here When It
Held That "All" Prepaid Calling Card Providers Are
Telecommunications Service Providers And Must Pay Access
Charges ..................................................................................................... 6

        1.    Judge O'Connor Of This District Has Agreed With The
AT&T LECs .................................................................................. 7

        2.    IDT Itself Has Conceded That The Pertinent Holding Does
Appear In The FCC's Order, And Does Apply To The
Service At Issue Here.................................................................... 8

        3.    IDT Reads Paragraph 27 Of The FCC's Order Out Of
Context......................................................................................... 8

    C.    The Telecommunications Act Of 1996 Did Not Destroy, But
Instead Preserved, Access Charges On The Long-Distance Calls At
Issue Here ............................................................................................... 10

    D.    The AT&T LECs' Tariffs Clearly Allow The AT&T LECs To
Collect Access Charges On The Calls At Issue Here.............................. 14

        1.    IDT Has Obtained – But Not Paid For – Originating
"Switched Access Service" As Defined By The Tariffs ............. 14

        2.    The Court Should Reject IDT's Baseless "Feature Group"
Argument ................................................................................... 17

    E.    IDT Has Constructively Ordered Access Services From The
AT&T LECs ............................................................................................ 18

II.    The AT&T LECs Are Entitled To An Injunction Enforcing Their Tariffs
And The FCC's Orders And Rules .................................................................... 21

III.    The Court Should Disregard IDT's Improper Attempt To Limit Damages ........ 23

i

# TABLE OF CONTENTS

**Page(s)**

    A.    IDT's Argument On Damages Is Not A Response To The AT&T LECs' Motion (Which Is Limited To The Issue Of Liability) ............... 23

    B.    In Any Event, IDT's "Feature Group A" Argument Lacks Merit ........... 23

        1.    The AT&T LECs Have Correctly Calculated Damages For "Jointly Provided Access" In Accordance With The FCC's Orders .......................................................................................... 23

        2.    There Is No Need To Decide Which "Feature Group" Applies In Order To Calculate Damages. .................................. 24

        3.    IDT's Analogy To "Jointly Provided Feature Group A" Falls Flat ................................................................................... 25

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

CASES

*Advamtel, LLC v. AT&T Corp.*,
  118 F. Supp. 2d 680 (E.D. Va. 2000) ....................................................................19

*Alliance Communications Coop. v. Global Crossing Telecommunications, Inc.*,
  663 F. Supp. 2d 807 (D.S.D. 2010) .................................................................... 20

*Alliance Communications Coop. v. Global Crossing Telecommunications, Inc.*,
  690 F. Supp. 2d 889 (D.S.D. 2010) ....................................................................17

*AT&T Co. v. City of New York*,
  83 F.3d 549 (2d Cir. 1996) .................................................................................19

*AT&T Co. v. FCC*, 572 F.2d 17 (2d Cir. 1978) .............................................................6

*AT&T Corp. v. Excel Comm'cns, Inc.*,
  1999 WL 1050064 (D. Del. Oct. 25, 1999) ..........................................................6

*MCI WorldCom Network Services, Inc. v. Paetec Communications, Inc.*,
  2005 WL 2145499 (E.D. Va. Aug. 31, 2005).......................................................17

*Southwestern Bell Tel. Co. v. FCC*,
  153 F.3d 523 (8th Cir. 1998) ..............................................................................13

*Southwestern Bell Tel. Co. v. Next-G Communication, Inc.*,
  No. 3:10-cv-1498-O (N.D. Tex. Nov. 22, 2011) ............................................... 7-8

*United States v. W. Elec. Co.*, 627 F. Supp. 1090 (D.D.C. 1986) .................................6

*WorldCom v. FCC*,
  288 F.3d 429 (D.C. Cir. 2002)............................................................................13

STATUTES

47 U.S.C. § 153 ..........................................................................................................11

47 U.S.C. § 251(g).................................................................................................. 10-11

iii

## FCC Orders

*AT&T Corp. v. YMax Communications Corp.*,
    26 FCC Rcd. 5742 (2011)............................................................................................17

*Elkhart Tel. Co. v. Southwestern Bell Tel. Co.*,
    11 FCC Rcd. 1051 (1995)...........................................................................................20

*Enhanced Telemanagement, Inc. v. Northwestern Bell Tel. Co.*,
    8 FCC Rcd. 4188 (1993).............................................................................................6

*In re Access Charge Reform: Reform of Access Charges Imposed by Competitive Local
    Exchange Carriers*,
    19 FCC Rcd. 9108 (2004).....................................................................................12, 16

*In re Amendment of Part 69 of the Commission's Rules to Ensure Application of Access
    Charges to All Interstate Toll Traffic*,
    102 FCC 2d 1243 (1985)............................................................................................12

*In re AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling
    Card Services*,
    20 FCC Rcd. 4826 (2005) ("*2005 Calling Card Order*")...........................................4, 13, 22

*In re Connect America Fund*,
    26 FCC Rcd. 4554 (Notice of Proposed Rulemaking, rel. Feb. 9, 2011)...............................23

*In re Connect America Fund*,
    2011 WL 5844975 (FCC rel. Nov. 18, 2011) .......................................................................11

*In re MTS & WATS Market Structure*,
    97 FCC 2d 682 (1983) ................................................................................12, 24, 25

*In re Petition of WorldCom, Inc.*,
    17 FCC Rcd. 27039 (2002)..........................................................................................13

*In re Regulation of Prepaid Calling Cards Services*,
    21 FCC Rcd. 7290 (2006) ("*Comprehensive Calling Card Order*") ..............................*passim*

*Starpower Communications, LLC v. Verizon South Inc.*,
    18 FCC Rcd. 23625 (2003)..........................................................................................13

*United Artists Payphone Corp. v. New York Tel. Co.*,
    8 FCC Rcd. 5563 (1993).............................................................................................19

## FCC Rules

47 C.F.R. § 69.2 ..............................................................................................................14

47 C.F.R. § 69.5 ................................................................................................................4

## INTRODUCTION

IDT has conceded the critical question at the heart of this case. That question is the one the Court posed at the outset, when it correctly held that "the federal regulations and FCC orders provide a clear path to determine if a calling card provider should be accountable for access charges: are they common carriers that offer a product that is considered telecommunications services?" June 3, 2010 Order (Dkt. No. 21) at 7-8. The AT&T LECs followed that clear path in their opening brief and showed that IDT is indeed "accountable for access charges" when the AT&T LECs originate and transport IDT's long-distance traffic. There is no dispute that (i) IDT *is* a common carrier, and (ii) IDT's prepaid calling card service *is* a telecommunications service.

The Court will read IDT's 38-page response in vain for any dispute on either of these dispositive points. IDT does not *mention* – much less address – the "clear path" set by the Court and the FCC. And IDT does not *mention* – much less dispute – the AT&T LECs' showing that IDT is a common carrier offering a telecommunications service. Plainly, IDT offers no dispute because there *is* no genuine dispute. So long as the Court holds to the FCC's "clear path," IDT is "accountable" for access charges on calls originated by the AT&T LECs.

Further confirmation of this conclusion is the effort IDT has expended to divert the Court from the path the Court itself directed the parties to follow. IDT's opposition tries to misdirect the Court down numerous sidetracks that have no merit. Most of IDT's arguments are shorthand copies of the arguments raised in its summary judgment brief. IDT is trying to distract the Court from what is really a simple case – because the Court's June 2010 Order, and the FCC's orders and rules, make it a simple case. As the AT&T LECs showed in their response to IDT's summary judgment motion, and confirm below, the Court should hold to its own "clear path," reject IDT's diversions, and grant the AT&T LECs (i) partial summary judgment on liability and (ii) an injunction enforcing IDT's obligation to pay access charges going forward.

**ARGUMENT**

**I.     There Is No Genuine Dispute As To Any Material Fact Regarding IDT's Liability.**

Because IDT has tried to obstruct the Court's path with irrelevant diversions, we begin by reminding the Court that the material facts are not in dispute. The plaintiffs are "local exchange carriers or **"LECs."** They provide local phone service in parts of 22 states, and they provide "access" to their local networks for long-distance providers ("interexchange carriers" or **"IXCs"**). When an end user makes a long-distance call from an AT&T LEC's phone line, that LEC "originates" the call and is entitled to "switched access charges" from the IXC.

Assume that an end user in Dallas' 214 area code buys local phone service from plaintiff Southwestern Bell ("AT&T Texas") and long-distance service from Sprint. Let's say he calls someone in Mexico by dialing the country code and phone number of that called party. AT&T Texas "originates" the call and carries it to Sprint; Sprint collects long-distance revenue from the end user, and AT&T Texas collects an access charge from Sprint. The Mexican country code and phone number tell AT&T Texas that the call is a long-distance call, so AT&T Texas knows it is to take the call to Sprint, and knows that access charges are due.

IDT also provides long-distance phone service, through prepaid calling cards. IDT's end users prepay for a specified dollar value in advance, and dial an access number to reach one of IDT's long-distance platforms. So let's say the end user in the illustration above wants to call that same number in Mexico, but this time with an IDT card. IDT's cards typically have (i) a "1-800" access number and (ii) an alternative set of "local access numbers" or **"LANs."** If the end user dials the 1-800 number, AT&T Texas originates the call and takes it to an intermediate carrier (the one that issued the 1-800 number to IDT) which in turn takes the call to IDT.  After IDT checks his identification and balance, the end user dials the same country code and Mexican phone number he dialed before; IDT delivers the call to Mexico and collects money from the

card balance. AT&T Texas and the 1-800 provider both collect access charges, and IDT does not dispute that the AT&T LECs are entitled to those access charges in this situation.

The legal dispute here arises when the cardholder takes the same IDT card and makes the same call to Mexico – but this time, he uses the 214 "local access number" to reach IDT's platform instead of the 1-800 number. Once again, AT&T Texas originates the call and takes it to the intermediate carrier that sold the access number to IDT – called a "competitive local exchange carrier" or **"CLEC."** Once again, the call goes to IDT and then on to the called party in Mexico. IDT's own diagrams show that all the steps in connecting a long-distance call, from the end user making the call to the called party at the destination, are identical whether the end user dials a 1-800 number or a LAN. Reply Appx. 2-3 (Skelton Tr. 36-39); Appendix to Opening Brief ("**Appx.**") 113-16 (diagrams). Even the name of the intermediate carrier in each case can be the same, because two of IDT's three CLECs offer LANs and 1-800 numbers alike. Reply Appx. 13-14 (Pressman Tr. 38, 119) But this time, the LAN makes the call look (to AT&T Texas) like a local call going to a Dallas phone served by a CLEC, not a call going to Mexico or a 1-800 call. As a result, none of the AT&T LECs billed access charges to IDT for such calls.

The AT&T LECs discovered IDT's arrangement in 2008 (see Appx. 77) and filed this suit to collect access charges going forward, and also going back to January 2007. IDT claims the calls are immune from access charges. The parties do agree that the Court can resolve IDT's liability as a matter of law, and have filed competing summary judgment motions. The AT&T LECs' motion, however, is the only one that follows this Court's "clear path."

    **A.**    **IDT Is "Accountable For Access Charges" Under This Court's Test.**

        **1.**    **IDT Ignores The "Clear Path" Charted By This Court And The FCC.**

The fundamental problem with IDT's approach to the purely legal question of liability is that IDT is acting as if the Court has to blaze an entirely new and uncharted trail through the

telecommunications statutes, with no guidance from the FCC's existing access charge rules or the FCC's existing orders applying the access charge rules to prepaid calling card providers. This is the same strategy IDT took at the outset of this case, when it asked the Court to stay this case, claiming that the FCC would swoop in and take care of the trail-blazing.

The error in IDT's approach is easy to see – because the Court has already seen it. The Court rejected IDT's motion to stay, precisely because there is no need to blaze a new trail. Instead, "the federal regulations and FCC orders provide a clear path to determine if [IDT] should be accountable for access charges: are they common carriers that offer a product that is considered telecommunications services?" June 3, 2010 Order (Dkt. No. 21) at 7-8.

The Court's framework was right then, and it is right now. As the Court recognized, the federal regulation directly on point states that interstate access "charges shall be computed and assessed upon *all* interexchange *carriers* that use local exchange switching facilities for the provision of interstate or foreign *telecommunications services.*" 47 C.F.R. § 69.5(b).[1]

Moreover, there are two "FCC orders" that follow the same "clear path." In 2005, the FCC held that a prepaid calling service (in which the cardholder received an advertisement when they reached the card provider's platform) was still subject to access charges, because it was "a *telecommunications service*" and because the FCC rejected the card provider's "claim that inserting advertisements in a calling card service transforms that service into an information service." *In re AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Servs.*, 20 FCC Rcd. 4826, ¶¶ 14-15 (2005) ("*2005 Calling Card Order*"). And in 2006, the FCC held that two more prepaid calling services were subject to access charges because "both types of prepaid calling cards are *telecommunications services* and … their providers are subject to regulation as *telecommunications carriers.*" *In re Regulation of Prepaid*

---

[1]  Unless otherwise stated, all emphases in quoted material have been added by the AT&T LECs.

*Calling Cards Servs.*, 21 FCC Rcd. 7290, ¶ 10 (2006) ("*Comprehensive Calling Card Order*").[2]

IDT criticizes the AT&T LECs' approach as "overly simple," but all the AT&T LECs did was follow the path that the FCC already blazed and that this Court clearly pointed out in its June 2010 Order. If IDT thought the *Court's* approach was "overly simple," it should have said so in its response brief, and then explained what it thought was wrong with the Court's opinion. It did not. Instead, IDT has simply recycled the legal arguments that it made *before* the Court's June 2010 order, and presented them as if the Court had never heard those theories before, and as if the Court had never even thought about how to approach the purely legal question of IDT's liability before. Obviously, the Court has done both.

### 2.   There Is No Genuine Dispute That IDT Is A Long-Distance Provider.

IDT does not dispute that it is a common carrier but now tries (at 3) to deny being a "long-distance provider" and "interexchange carrier." This is a complete about-face from IDT's own admissions. IDT's Answer admits that "IDT Telecom *provides long distance services* through pre-paid calling cards." Dkt. No. 26, ¶ 25. Every one of IDT's calling cards says that the long-distance "[s]ervice [is] provided by IDT Telecom" or "Entrix." Appx. 122 (Katz Tr. 116).



Appx. 120 (Katz Tr. 88).

. AT&T LEC Appx. 35-76.

The only explanation IDT offers for its about-face (at 3) is that it "purchases its

---

[2]   To make matters even more simple, the same FCC order went on to hold that "*all* prepaid calling card providers will now be treated as telecommunications service providers" (*id.* ¶ 10) and thus be required to pay access charges (*id.* ¶¶ 21, 27). IDT tries to limit this latter holding, and the AT&T LECs refute IDT's argument in Section I.B below. But the Court need not even reach that issue, because whatever the scope of the FCC's global holding, there is no dispute that the FCC followed the same "clear path" the Court told the parties to follow in its own June 2010 order – and that the Court's path leads directly to the conclusion that IDT is liable.

telecommunications services from other carriers": that is, IDT does not own long-distance wires, but instead buys transmission service at wholesale and then resells that service. IDT's claim is irrelevant. "[U]nder the FCC's interpretation, ... a common carrier is one which undertakes indifferently to provide communications service to the public for hire, *regardless of the actual ownership or operation of the facilities involved." AT&T Co. v. FCC*, 572 F.2d 17, 24 (2d Cir. 1978). Thus, the FCC has held that "carrier charges for local switched access services apply equally to facilities-based interexchange carriers *and to interexchange resale carriers.*" *Enhanced Telemanagement, Inc. v. Northwestern Bell Tel. Co.*, 8 FCC Rcd. 4188, ¶ 10 (1993).

Courts also recognize that IXCs can be "either 'facilities-based,' or 'resellers.'" *AT&T Corp. v. Excel Comm'cns, Inc.*, 1999 WL 1050064, at *1 n.1 (D. Del. Oct. 25, 1999) (Reply Appx. 34). "Resellers are regulated as common carriers by the FCC even though they do not actually carry the long-distance calls of their customers." *Id*.; see also *United States v. W. Elec. Co.*, 627 F. Supp. 1090, 1101 n.43 (D.D.C. 1986) ("Many of the companies engaged in the interexchange telecommunications business do not own transmission facilities but are resellers. Resellers are considered common carriers by the FCC."). The *material* fact is not who owns the wires, but who sells long-distance service to end users – and here, that is IDT.

### B. The FCC Conclusively Decided The Issue Presented Here When It Held That "All" Prepaid Calling Card Providers Are Telecommunications Service Providers And Must Pay Access Charges.

The absence of any genuine dispute on the two-part test articulated by the Court compels the conclusion that IDT is "accountable for access charges" under "federal regulations and FCC orders." The Court can confirm that conclusion on the alternative ground that the FCC's *Comprehensive Calling Card Order* held that "*all* prepaid calling card providers will now be treated as telecommunications service providers" (*id*. ¶ 10) and are thus subject to access charges (*id*. ¶¶ 21, 27) without any exceptions.

6

In their opening brief (at 11-14 and 21-23), the AT&T LECs provided a lengthy analysis of the FCC's order and the history of the FCC's rulemaking, to show that the FCC's access charge requirements apply to *all* prepaid calling card providers. Notwithstanding the AT&T LECs' detailed discussion, IDT claims that the FCC's holding "appears **nowhere** in the 2006 order" and was instead "fashioned" by the AT&T LECs. IDT Mem. at 1 (emphasis provided by IDT). The AT&T LECs have already refuted IDT's misreading of the FCC's order at length in their response to IDT's summary judgment brief (Dkt. No. 103 at 5-10). Rather than repeating that discussion here, the AT&T LECs focus here on three key points below.

### 1.    Judge O'Connor Of This District Has Agreed With The AT&T LECs.

While IDT claims that the AT&T LECs "fashioned" the FCC's holding that all prepaid card providers must pay access charges, Judge O'Connor of this District has reached the same conclusion the AT&T LECs have, in a similar lawsuit by the AT&T LECs against another prepaid card provider. *Southwestern Bell Tel. Co. v. Next-G Communication, Inc.*, No. 3:10-cv-1498-O (N.D. Tex. Nov. 22, 2011) (Reply Appx. 15-33). In that case, "Next-G argue[d] that in its 2006 Order the FCC addressed prepaid calling card providers' liability for access charges only where callers used 1-800 numbers to connect to a prepaid calling card provider's network, not where a LAN [local access number] was used" – the same position IDT takes here. Reply Appx. 23. Judge O'Connor, however, rejected that argument and denied Next-G's motion to dismiss or stay the suit. As Judge O'Connor held, the rules in the 2006 Order are "applicable to '*all* prepaid calling card providers,'" just as the AT&T LECs have said. Reply Appx. 29.[3]

The Judge recognized that the FCC *started* by addressing "menu-driven" and "Internet protocol" cards. Reply Appx. 29. But he also saw that "[a]fter making this initial determination, the FCC expanded its holding to set forth rules for *all* prepaid calling card providers during the

---

[3]  The parties later settled, and the Court entered a consent judgment in the AT&T LECs' favor. Reply Appx. 33A.

interim period" (while the FCC considered prospective reforms of the rates on all inter-carrier charges). *Id.* The "FCC made clear that the articulated rules would apply, at least on an interim basis, to *all* prepaid calling card providers." *Id*. The Judge's 19-page opinion contains a careful analysis of the FCC's order, and the AT&T LECs ask this Court to reach the same conclusion.

### 2. IDT Itself Has Conceded That The Pertinent Holding Does Appear In The FCC's Order, And Does Apply To The Service At Issue Here.

The dispositive FCC holding appears in paragraph 10, which squarely states that "*all* prepaid calling card providers will now be treated as telecommunications service providers." *Comprehensive Calling Card Order*, ¶ 10. IDT itself concedes (at 6) that paragraph 10 applies to all prepaid calling services, including the LAN service at issue here. IDT fails to acknowledge the consequences of its concession. But the FCC's order quite clearly spells out those consequences. Once a given prepaid calling card service is deemed to be a telecommunications service, the providers of that service are "subject to all of the applicable requirements of the Communications Act and the Commission's rules, including requirements to contribute to the federal USF *and to pay access charges*." *Comprehensive Calling Card Order*, ¶ 21. The very first paragraph of the FCC's order states the same conclusion: that telecommunications service providers "must pay intrastate access charges for interexchange calls that originate and terminate in the same state and interstate access charges on interexchange calls that originate and terminate in different states." *Id*. ¶ 1. Likewise, this Court has correctly understood that whether a "party provides a telecommunications service" is "the critical inquiry" in deciding whether that party must pay access charges. June 3, 2010 Order (Dkt. No. 21) at 4. IDT has thus conceded that the FCC's 2006 order resolves this "critical inquiry" in favor of the AT&T LECs.

### 3. IDT Reads Paragraph 27 Of The FCC's Order Out Of Context.

After conceding that the dispositive holding of paragraph 10 does apply to the IDT service at issue here, IDT embarks on a pointless argument about paragraph 27. That paragraph

notes that some parties (including IDT itself) "questioned the logistics of *requiring all prepaid calling card service providers to pay intrastate and interstate access charges.*" *Comprehensive Calling Card Order*, ¶ 27. The FCC then resolved those questions – not by making exceptions for any flavor of prepaid service, but by establishing reporting requirements that apply to all providers. See *id.* ¶¶ 29-31, 38-41, 47. IDT reads this sentence in isolation, arguing that it states a question raised by parties rather than an FCC holding. But IDT is missing three critical points.

**First,** *why* did IDT and the other parties to the FCC proceeding "question[] the logistics of requiring all prepaid calling card service providers to pay intrastate and interstate access charges"? Because they understood the FCC was considering just such a broad requirement. Before the FCC issued its order, one party petitioned the FCC to "subject[] *all* prepaid calling card service providers to the same types of access charges," and one of its proposals was that "the Commission rule that *all* prepaid calling card service providers are subject to both intrastate and interstate access charges." *Comprehensive Calling Card Order*, ¶ 6.

**Second,** why did the FCC address "the logistics of requiring all prepaid calling card service providers to pay intrastate and interstate access charges"? If the access charge holdings of its order were truly limited to two specific calling card services, the way that IDT contends, there would have been no need to consider logistics for *all* services, and the FCC's discussion would have been superfluous. The only reason to even think about the logistics of "requiring all prepaid calling card service providers to pay intrastate and interstate access charges" is if the FCC had decided to require exactly that – as it did in paragraph 10.

**Third,** how did the FCC resolve the question about logistics? It did not create an exception for any card services: not only does no exception appear anywhere in the order, but the FCC stated that any exceptions would be contrary to the public interest. *Comprehensive Calling Card Order*, ¶¶ 8-9. And the FCC certainly did not create an exception for cards that use "local"

9

access numbers. As IDT has admitted (Dkt. No. 88, at 13), the FCC was informed about such cards before issuing the 2006 order, yet none of the parties asked the FCC to make an exception for those cards. In fact, Level 3 – a CLEC that is also one of IDT's local-number suppliers – advocated that "when the call to the platform is a locally-dialed number provisioned as a DID service by a LEC, the jointly provided access model applies, and the originating LEC [here, an AT&T LEC] would bill the platform provider [here, IDT] ... for access." Dkt. No. 81-2, Appx. 501. Moreover, IDT itself was one of the parties that questioned logistics, and rather than requesting that its LAN services be deemed exempt, IDT simply asked the FCC to make the reporting requirements less burdensome. *Comprehensive Calling Card Order*, ¶¶ 30-31.

Instead, the FCC addressed logistics by establishing certification and reporting requirements. The FCC's order repeatedly states that those requirements apply to all card providers. *Id.* ¶ 1 ("[W]e require *all* prepaid calling card providers to comply with certain reporting and certification requirements."); *id*. ¶ 38 ("*[E]very* prepaid calling card provider must submit a certification"). IDT's own brief concedes (at 6) that those requirements apply to all providers. Yet once again IDT ignores the fatal consequences of its concession. The purpose of the reporting rules is to "ensure compliance with [the FCC's] existing access charge rules." *Id*. ¶ 31. Thus, the only reason for the reporting requirements to apply to all prepaid calling card providers, including those that use LANs – as IDT concedes to be the case – is if the underlying "access charge rules" *also* apply to "all" prepaid card providers. Read in context, then, paragraph 27 of the FCC's order is a succinct confirmation that the order is indeed one "requiring *all* prepaid calling card service providers to pay intrastate and interstate access charges."

### C. The Telecommunications Act Of 1996 Did Not Destroy, But Instead Preserved, Access Charges On The Long-Distance Calls At Issue Here.

To avoid the Court's "clear path," IDT turns to the federal Telecommunications Act of 1996. IDT's diversion goes nowhere because section 251(g) of the Act preserves the AT&T

10

LECs' right to assess access charges. It provides that "[o]n and after the date of enactment of the Telecommunications Act of 1996, each local exchange carrier ... shall provide *exchange access*" under the same terms – "including receipt of compensation" – that "apply to such carrier" immediately before the Act. 47 U.S.C. § 251(g).

The service provided by the AT&T LECs here falls squarely within the "exchange access" protected by section 251(g). The Act defines "exchange access" as "the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." *Id*. § 153(20). "Telephone toll service," in turn, is "telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service" *Id*. § 153(55). There is no dispute that IDT's long-distance calling cards provide "telephone service between stations in different exchange areas" (usually, in different *countries*) and there is no dispute that IDT assesses a "separate charge" for those calls that is not included in the end user's bills for local exchange service (by making its end users buy calling cards, and then deducting money from the cards when the end users make long-distance calls). Thus, "exchange access" is exactly what the AT&T LECs are providing here: access to their "telephone exchange services or facilities" for the "origination" of IDT's "telephone toll services." *Id*. § 153(20).[4]

IDT claims the access service is different here, but the asserted distinctions make no difference. **First**, IDT asserts that the AT&T LECs are delivering the calls to IDT's platform indirectly (by delivering them to IDT's intermediate carrier, the CLEC, which in turn takes them to IDT), rather than taking them all the way to IDT directly. That is irrelevant. At the dawn of the

---

[4]   The FCC's recent order on intercarrier compensation reaffirms that "section 251(g) continues to preserve originating access." *In re Connect America Fund*, 2011 WL 5844975, ¶ 778 (FCC rel. Nov. 18, 2011). The AT&T LECs discussed the FCC's order in more detail at pages 10-12 of their opposition to IDT's summary judgment motion (Dkt. No. 103). A more detailed discussion of section 251(g) and refutation of IDT's arguments appears at pages 12-25 of that opposition.

access regime in the early 1980s, the FCC held that "[t]ransport and switching of interstate traffic originating or terminating in an extended area will still be deemed access services" even though the access work was being done by two local carriers instead of one, and even though the two carriers operated in the same calling area. *In re MTS & WATS Market Structure,* 97 FCC 2d 682, ¶ 191 (1983). Two years later, the FCC again reaffirmed its "clear intent" that the access charge regime "would include the costs of interstate access arising from the use of EAS [extended area service] facilities, *whether in a single carrier environment or in a multicarrier arrangement*." *In re Amendment of Part 69 of the Commission's Rules to Ensure Application of Access Charges to All Interstate Toll Traffic*, 102 FCC 2d 1243, ¶ 12 (1985). In fact, the "multicarrier arrangement" in that order was one in which end users "access[ed] an interexchange carrier's network toll free by calling its seven-digit access number" (¶ 1 n.1) so the originating LEC could not tell whether the call "[wa]s actually [a local] call or whether it [wa]s a toll call" (*id*. ¶ 3) – the same as IDT's arrangement here. See also Dkt. No. 103 at 19-23 for a more detailed discussion of this decision.

**Second**, IDT claims that its arrangement is new (and thus not subject to the preservation of access charges under section 251(g)) because the intermediate carrier is a CLEC, and CLECs did not exist before the 1996 Act. But if IDT's view was correct, then CLECs could never assess access charges for transporting any long-distance calls; moreover, long-distance carriers (even familiar brand names like Sprint) could have wiped out the access charge regime by funneling their traffic through CLECs. No court or agency has ever adopted IDT's extreme position. To the contrary, the FCC has ruled that the incumbent and CLEC alike may charge for the access services they actually provide, and cannot charge for services they do not provide (for example, a CLEC cannot charge for facilities at the originating point of a call if the incumbent originated the call and the CLEC was just a middleman). *In re Access Charge Reform: Reform of Access Charges Imposed by Competitive Local Exchange Carriers*, 19 FCC Rcd. 9108, ¶¶ 10-16 (2004).

Moreover, the FCC has squarely held that an incumbent local carrier like the AT&T LECs is entitled to bill an interexchange carrier for access charges when the LEC and a CLEC jointly deliver long-distance calls to that IXC. In 2002, the FCC's Wireline Competition Bureau (acting through authority delegated from the FCC), considered the appropriate charges for "meet point" facilities carrying long-distance calls between an incumbent (Verizon) and a CLEC (WorldCom) en route to IXCs. *In re Petition of WorldCom, Inc.*, 17 FCC Rcd. 27039, ¶¶ 1-16, 172-77 (2002). The FCC held that these facilities "constitute the joint provision of switched exchange access services to IXCs by WorldCom and Verizon, both operating as LECs." *Id.* ¶ 177. Therefore, "when the parties jointly provide such exchange access, Verizon should assess any charges for its access services upon the relevant IXC, not WorldCom." *Id.*

IDT's reliance on *WorldCom v. FCC*, 288 F.3d 429 (D.C. Cir. 2002) (IDT Mem. 13-14) and *Starpower Commc'ns v. Verizon South*, 18 FCC Rcd. 23625 (IDT Mem. 9-10) is unfounded. Those cases did not deal with long-distance voice calls, but with dial-up data traffic delivered to Internet service providers ("ISPs"). Unlike long-distance phone calls, ISP traffic is not subject to access charges under section 251(g) – not because it is delivered to the ISP through an intermediate CLEC, but because ISPs were expressly exempt from all access charges before and after the 1996 Act. *Southwestern Bell Tel. Co. v. FCC*, 153 F.3d 523, 541 (8th Cir. 1998). IDT is not an Internet service provider, but an IXC. IDT's asserted "industry practice" of designating long-distance calls by the phone numbers of the calling and called parties (IDT Mem. 9) does not help IDT either, because the calling and called parties here have phone numbers in different states or even different countries. If IDT is suggesting that the "called party" is IDT's platform, the FCC has squarely rejected that theory. *2005 Calling Card Order*, ¶ 23 ("[T]he Commission has never found this communication [with the platform] to be relevant"); see also *id.* ¶ 26 ("[T]he only relevant communication … is from the calling card caller to the called party").

**D.      The AT&T LECs' Tariffs Clearly Allow The AT&T LECs To Collect Access Charges On The Calls At Issue Here.**

**1.      IDT Has Obtained – But Not Paid For – Originating "Switched Access Service" As Defined By The Tariffs.**

IDT fares no better arguing that the service it obtained does not appear in the AT&T LECs' tariffs. Using Southwestern Bell's federal tariff as an example, the very first paragraph of the relevant section describes the service IDT obtained: "Switched Access Service." Appx. 179 § 6.1. That service "provides a two-point communications path between a customer's premises and an end user's premises" that "provides for the ability to originate calls from an end user's premises to a customer's premises." *Id*. The access "customer" is "any" entity "which subscribes to the services offered under this tariff, including ... Interexchange Carriers." Appx. 174.[5] An "end user" is "any customer of an interstate or foreign telecommunications service that is not a carrier" – in other words, the retail customer who buys long-distance phone service from the IXC. IDT Appx. 620; see also 47 C.F.R. § 69.2(m) (FCC rule providing similar definition). So, for the calls here, the access "customer" is IDT (the interexchange carrier) and the "end user" is the retail customer making a long-distance call with an IDT card.

As the AT&T LECs showed in their opening brief (at 6-9, 23-24), IDT has obtained originating "Switched Access Service" pursuant to section 6.1 of the tariff. Indisputably, for each call IDT obtained "a two-point communications path" from its retail end user to IDT's "premises" so IDT could send that call on to its long-distance destination. The AT&T LECs originated each call and took it from the end user to IDT's CLEC middleman. From the perspective of the AT&T LECs, the CLEC's network is the "premises" of IDT, the access customer: IDT has made that the place where the AT&T LECs are to deliver IDT's calls, and it

---

[5]    As the AT&T LECs showed in their opening brief, and confirm in Section I.E below, IDT constructively "subscribe[d]" to the tariffed services.

has given the CLEC a contractual duty to take the calls from there to IDT's platform. Even if one considers IDT's "premises" to be the IDT platform, IDT has still received a communications path from the end user to that platform. An indispensable part of that path – the starting leg that begins where IDT's end user makes the call – comes from the applicable AT&T LEC (the remainder comes from IDT's CLEC).

Either way, because of the AT&T LECs, IDT obtained "the ability to originate calls from [each] end user's premises" to its platform. Conversely, without the path provided by the AT&T LECs, IDT would not have received any calls originating from the many end-user "premises" on the AT&T LECs' networks. In IDT's own words, its long-distance service is "useless" without the communications path provided by the AT&T LECs. Appx. 5 (Mendelson Tr. 85). Yet IDT has not paid the AT&T LECs anything for the service they provide.

IDT (at 18) misreads section 6.1. IDT says that section only allows access charges when the AT&T LEC provides *all* communications services and facilities, all the way from the end user to IDT's platform. But section 6.1 does not say that. Rather, section 6.1 simply requires a "communications path" between the end user and the access customer that is provided "through" the "plant of the Telephone Company [the AT&T LEC]" – without saying whether the path must be provided *wholly* through the AT&T LECs' "plant" or *partly* through the AT&T LECs' plant.

Thus, section 6.1 does not preclude the AT&T LEC from collecting access charges when it and another local carrier "jointly" provide the communications path. Nor would one expect such a bar, because the AT&T LECs' right to collect access charges in that situation was established long ago by the FCC. Section 2.6 of the tariff ("Jointly Provided Access Services") implements that federal right, and applies section 6.1 to the specific situation where the path is provided jointly by the AT&T LEC and a second local carrier.

15

Section 2.6 states that "Jointly Provided Access Service has one end of the service in one exchange telephone company operating territory and the other end of the service in another exchange telephone company operating territory." Appx. 170. That is what has happened here. "One end" of the communications path between the end user and the IDT platform (the part that starts at the end user) is in the operating territory of "one exchange telephone company" – the AT&T LEC. "[T]he other end of the service" is in the operating territory of "another exchange telephone company" – the CLEC. Moreover, that "other end" is IDT's platform in New Jersey, which is outside the operating territory of the AT&T LECs (none of which operate anywhere in New Jersey). Thus, section 2.6.3 allows "each exchange telephone company providing service to bill the customer for its portion of a jointly provided access service according to its Access Service Tariff charges." Appx. 172.

IDT says (at 20) that the two LEC's territories have to be different – but they *are* different, so IDT goes nowhere there. The operating territories of incumbent phone companies like the AT&T LECs were set long ago by state franchise regulations. By contrast, CLECs choose their own territories based on their own business plans, without regard to the old regulatory boundaries. Nothing requires them to serve the *entire* territory of any incumbent, and nothing precludes them from operating beyond that incumbent's territory. See *In re Access Charge Reform*, ¶¶ 46, 48 (CLEC service areas can comprise "different incumbent LEC territories" served by "more than one incumbent LEC"). Obviously, that has happened here: IDT's CLECs are taking calls to IDT's platforms in New Jersey, and none of the AT&T LECs operates anywhere in that state.[6]

---

[6]   A given CLEC's territory may overlap the AT&T LEC's territory in some places, but nothing in section 2.6 prohibits overlapping territories. Nor would such a prohibition make sense. The tariffs implement federal regulations, and as described in Section I.C above, the FCC has held both carriers that jointly take calls to an IXC may collect access charges, even when (i) the two local phone companies serve the same calling area and (ii) one of the local carriers is a CLEC.

16

**2.      The Court Should Reject IDT's Baseless "Feature Group" Argument.**

To avoid the governing tariff provisions, IDT tries changing the subject to "Feature Groups." IDT's theory is that the access service it obtained must precisely match all the technical specifications for one of four Feature Groups (A, B, C, or D) or else IDT gets off scot-free.

A detailed discussion of Feature Groups appears at pages 29-34 of the AT&T LECs' opposition to IDT's summary judgment brief (Dkt. No. 103). Briefly, IDT's argument fails because it does not cite a single authority that ever adopted, applied, or even considered IDT's theory that a party must show that its service fits a particular "Feature Group" to collect access charges. The only IDT-cited decisions that actually addressed access tariffs support the AT&T LECs' application of the law, not IDT's test. Rather than looking at Feature Groups, those cases applied the straightforward test the AT&T LECs have applied (and satisfied) here: whether the local carrier provided "Switched Access," a communications path between the end user and the access customer that provides the ability to originate calls. *AT&T Corp. v. YMax Commc'ns Corp.*, 26 FCC Rcd. 5742, ¶ 15 (2011); *MCI WorldCom Network Servs., Inc. v. Paetec Commc'ns, Inc.*, 2005 WL 2145499, at *4 (E.D. Va. Aug. 31, 2005); *Alliance Commc'ns Coop. v. Global Crossing Telecommunc'ns, Inc.*, 690 F. Supp. 2d 889, 894 (D.S.D. 2010).

IDT's argument also fails on the facts. The service provided by the AT&T LECs here is functionally equivalent to Feature Group D. Dkt. No. 103, at 33-34.

IDT's argument (at 22-24) about the ordering provisions of the Southwestern Bell tariff does not support (and in fact refutes) its theory. IDT's view is that the four "Feature Groups" are the only "services" an access customer can obtain. But the ordering provisions do not say that: rather, by their plain terms, they simply specify the information that the customer must supply *if* the customer orders a given arrangement. *E.g.* IDT Appx. 1376-77 (order information required for Feature Group B, C, and D arrangements).

17

Further, IDT's resort to the ordering provisions is contrary to the structure of the tariffs as a whole. Southwestern Bell's access *service* – the communications path that provides the ability to originate long-distance calls – is described in section 6.1. Appx. 179.  Section 6.1 provides a "General Description," and refers the reader to section 6.8 for "[a] more detailed description" of the individual service elements for which Southwestern Bell "charges" the customer. *Id*. Section 6.8, in turn, specifies the *a la carte* prices for each of the many service components or "rate elements," like local switching.  Appx. 180-83.

Feature Groups are shorthand descriptions of connection types and specifications ("groups" of "features") that facilitate the ordering process – a point IDT has confirmed by citing the tariff's ordering provisions. Feature Groups are not the actual *service* (which is described in section 6.1); they describe the connection arrangements the customer can order and the AT&T LEC can use in providing that service. This is confirmed by the tariff's pricing provisions, which do not contain prices for any "Feature Group"; rather, the actual rate elements used are priced *a la carte*. Appx. 148 ¶ 24 & 180-83. It is disingenuous for IDT to invoke the tariff's ordering provisions and to use Feature Groups – which were designed to facilitate the ordering process – as an argument to avoid payment for services IDT obtained *without* placing an order.

### E.     IDT Has Constructively Ordered Access Services From The AT&T LECs.

The Court has held that "[a] telecommunications provider may constructively order services when it … (1) is interconnected in such a manner that it can expect to receive access services, (2) fails to take reasonable steps to prevent the receipt of services, and (3) does in fact receive such services." June 3, 2010 Order (Dkt. No. 21) at 10 (quotation omitted). The AT&T LECs satisfied each element of that test in their opening brief (at 24-27), and reaffirmed that conclusion in their opposition to IDT's summary judgment brief (Dkt. No. 103 at 34-39).

IDT's arguments fail. **First,** IDT argues (at 26) that it is interconnected with the AT&T

18

LECs *indirectly* (through IDT's CLEC middlemen) rather than directly. That makes no difference. Several cases have found the constructive ordering doctrine to be applicable in the indirect-connection setting. Indeed, the FCC *announced* the doctrine in an indirect-connection case. See *United Artists Payphone Corp. v. New York Tel. Co.*, 8 FCC Rcd. 5563 (1993). There, the defendant was "connected to the public network" and ultimately to the plaintiff long-distance carrier indirectly, "by public access lines purchased from" the local phone company New York Telephone (which played the middleman role that IDT's CLECs are playing here). *Id*. ¶ 2.

Likewise, in *Advamtel, LLC v. AT&T Corp.*, 118 F. Supp. 2d 680, 682 (E.D. Va. 2000) a group of CLECs alleged that a long-distance provider constructively ordered access services on calls that originated on the CLECs' networks and reached the defendant "long-distance carrier's network" indirectly, "*via* the … facilities and equipment" of an intermediate local carrier (the incumbent). The defendant moved for summary judgment, alleging that it had not ordered access services (as IDT claims here), but the court found summary judgment inappropriate "[g]iven the applicability of the constructive ordering doctrine in this matter." *Id*. at 687.

And in *AT&T Co. v. City of New York*, the defendant city was connected to the plaintiff long-distance carrier indirectly, through phone lines installed by New York Telephone. 83 F.3d 549, 551 (2d Cir. 1996). The appellate court held the defendant "may reasonably be held to have constructively ordered service" so long as it "did not take appropriate steps to prevent unauthorized access from its phones to the long-distance network." *Id*. at 555.

IDT claims (at 27) that the long-distance provider must "designate" a point where calls are to be received, but it has effectively done so here. IDT is a retail long-distance provider and its "local" access numbers designate where IDT's traffic is to go. When an IDT end user dials one of IDT's numbers from an AT&T LEC phone line, that instructs the AT&T LEC to deliver the call to IDT's CLEC middleman, and instructs the CLEC to take the call to IDT's platform.

19

IDT's arrangement concealed the call's *ultimate* destination from the AT&T LECs, but that is hardly a reason for IDT to escape liability.[7]

**Second,** IDT contends (at 27) that the "mere receipt of a call that originated on Plaintiffs' networks does not constitute 'receipt' of Plaintiffs' access services." This case is not about IDT's "mere receipt of a call that originated on Plaintiffs' networks." This case is about IDT setting up connections so it can receive and has received *millions* of calls originating on the AT&T LECs' networks, because IDT *wants* to receive those calls and makes money when it receives them. This case is about IDT continuing to receive calls (and refusing to pay the AT&T LECs anything for carrying those calls) even after the AT&T LECs told IDT it was violating the law. IDT's business is *based* on its "receipt of calls" from cardholders around the country. IDT's own executive vice president admitted that IDT's business is based on "the assumption" that end users will "be able to hit our platform" from any local phone, and it is IDT's "desire that the end user can make a phone call to [IDT's] platform from as many places as possible." Appx. 5 (Mendelson Tr. 85). It is "important to [IDT's] business" that calls originating from the AT&T LECs' networks can get through to IDT – so important that IDT's calling service is "useless" without that ability. Appx. 5-6 (Mendelson Tr. 85, 86, 87). Thus, "[t]he acceptance of a call by the IXC [here, IDT] from [Southwestern Bell's] network signifies an implicit agreement to provide compensation for the call; moreover, the call clearly provides a benefit to an IXC in the business of selling long distance service." *Elkhart Tel. Co. v. Southwestern Bell Tel. Co.*, 11 FCC Rcd. 1051, ¶ 30 (1995).

---

[7]   IDT's citation to *Alliance Communications Coop. v. Global Crossing Telecommunications, Inc.*, 663 F. Supp. 2d 807 (D.S.D. 2010) is inapposite. There, the local exchange carriers did not sue the retail IXC that sold long-distance service to end users (which was called "Express"); instead, they sued wholesale suppliers that had provided transmission services for pieces of each call to the retail IXC. Here, the AT&T LECs are suing the retail IXC – IDT – which has used "local" access numbers to designate the "premises" where its calls are to be delivered.

20

**Third,** IDT argues (at 28) that "***Plaintiffs have no access services for IDT to use***" (emphasis by IDT). The AT&T LECs obviously have switched access services, and IDT has used them. See Section I.D *supra.* What IDT really means is that the AT&T LECs are not willing to offer IDT an arrangement identical to that provided by IDT's CLECs today, in which the AT&T LECs would step into the role now played by IDT's CLECs. That arrangement disguises prepaid long-distance calls as local, and the AT&T LECs have no desire to mislead other LECs the way that the AT&T LECs have been misled.

**Fourth,** IDT claims (at 29) that it took steps to prevent the receipt of services from the AT&T LECs by ordering services from CLECs. But IDT has not obtained its access *solely* from CLECs. For the calls at issue here, IDT's CLECs are simply middlemen that handle *part* of the journey: from their point of interconnection with the applicable AT&T LEC, to IDT's platform. The transportation service for the essential opening leg of the journey – from the end user who makes a call with an IDT card, to IDT's CLEC – is provided by the AT&T LECs. As the AT&T LECs have shown, IDT has taken no steps whatsoever to prevent the AT&T LECs from performing that service. In fact, IDT has taken steps to *ensure* that the AT&T LECs continue to originate and carry IDT calls, by issuing "local access" cards to the public (including persons who buy their local phone service from an AT&T LEC), and by demanding that service be restored "ASAP" when technical difficulties prevented calls originated by one AT&T LEC from reaching IDT's platform. AT&T LEC Mem. at 25-26.

## II.   The AT&T LECs Are Entitled To An Injunction Enforcing Their Tariffs And The FCC's Orders And Rules.

The AT&T LECs' request for injunctive relief addresses the following question. What if the Court finds that IDT is "accountable for access charges" under the law, as the AT&T LECs have shown? The AT&T LECs' answer is simple: IDT should obey the law and the Court's ruling, and start paying those charges immediately. IDT's view (at 36) is that "*even if this Court*

21

*finds that IDT is liable*," the Court should not order IDT to comply. Thus, IDT would simply ignore the Court's ruling and continue riding the AT&T LECs' networks for free. IDT claims that its non-compliance should continue until after trial is completed to assess damages for IDT's *past* evasions, but it makes no assurances that it would comply even after that.

The Court should reject IDT's position out of hand. The law requires IDT to pay for its use of the AT&T LECs' networks. IDT does not dispute the AT&T LECs' showing that IDT's continued evasion would cause them irreparable harm going forward. The fact that IDT has never complied with the law, and has racked up five years' worth of damages (the AT&T LECs' damages case goes back to January 2007) is hardly a reason to let IDT keep disobeying the law even after the Court rules that IDT must pay. It is simply more reason for IDT to comply now. Under IDT's view, when the damages trial is over, the parties would have to litigate another damages case to address the charges IDT evaded while the trial was going on – and when that trial ends, another trial would be necessary to address damages during the second trial, and so on.

IDT complains (at 37) about the "hardships" it would face obeying the law, based on its conclusory assertion that its profit margins on calling cards are "razor thin." IDT offers no evidence to support that assertion, and certainly does not present any showing that compliance would present any serious financial hardship to a self-described "global leader" like IDT. Appx. 88. More fundamentally, IDT offers no legal authority that allows any company to flout federal law simply to preserve its profit margins.

Equally hollow is IDT's claim that the "public interest" supports IDT's continued refusal to pay access charges even in the face of a Court ruling on liability. The public interest is that companies obey the law and pay for the services they receive. The FCC is fully aware that low income users buy calling cards (*2005 Calling Card Order*, ¶ 10), but has decided that the companies who sell those cards must pay the access charges required by law. After all, access

charges were created so that local carriers could "keep residential rates low." *In re Connect America Fund*, 26 FCC Rcd. 4554, ¶ 48 (Notice of Proposed Rulemaking, rel. Feb. 9, 2011). Thus, access charges also help low-income consumers (those who buy IDT's cards *and* those who do not). Further, IDT presents no evidence that compliance would force IDT to "driv[e] up" its prices (IDT Mem. at 37) to any material extent.

**III.    The Court Should Disregard IDT's Improper Attempt To Limit Damages.**

    **A.    IDT's Argument On Damages Is Not A Response To The AT&T LECs' Motion (Which Is Limited To The Issue Of Liability).**

The last argument in IDT's response brief is not a response to the AT&T LECs' motion at all. The AT&T LECs seek partial summary judgment on liability, and expressly left the issue of damages for trial. IDT now seeks to limit damages, based on an argument about "Feature Group A." That is not a proper response, as it has nothing to do with the issue of liability and does not respond to any argument in the AT&T LECs' brief.

Essentially, IDT is presenting an argument to *support* summary judgment for itself on *damages*, rather than to *oppose* summary judgment for the AT&T LECs. But the Court's deadline for dispositive motions was November 18, 2011. IDT filed a summary judgment motion on that date, but did not present the Feature Group A argument that it now wants to assert. IDT is thus trying to file a second summary judgment brief, 21 days after the deadline, without even asking the Court for leave. The Court should disregard IDT's improper argument out of hand.

    **B.    In Any Event, IDT's "Feature Group A" Argument Lacks Merit.**

        **1.    The AT&T LECs Have Correctly Calculated Damages For "Jointly Provided Access" In Accordance With The FCC's Orders.**

IDT claims (at 31) that the AT&T LECs' damages calculation "utterly ignores" the fact that they are providing access "jointly" with IDT's CLECs. Notably, IDT provides no real citation to support this statement; IDT simply directs the Court to the 52-page report of the

AT&T LECs' expert economist, without saying where to look. IDT Mem. at 31 ("*See generally*, IDT's Mot. Summ. J. at App. 47-98, Aron Report"). In reality, the AT&T LECs calculated damages in accordance with the FCC's rules (and their tariffs) for jointly provided access.

It is long settled that when two local carriers jointly provide access service to an IXC, "each may simply bill and collect separately for the access services it provides" unless both carriers "agree on a formula for the division of access revenues." *In re MTS & WATS Market Structure,* ¶ 191. Likewise, the AT&T LECs' tariff provisions for jointly provided access state that each local carrier may "bill the customer for its portion of a jointly provided access service according to its Access Service tariff charges" (Appx. 172 § 2.6.3) absent an advance agreement to split a single bill. Plainly, the AT&T LECs did not reach agreement to split access charges on these calls with any CLEC; the AT&T LECs did not even know the calls were long-distance calls going to IDT. Accordingly, the AT&T LECs calculated damages exactly as the FCC and the tariffs have instructed them to do where there is no sharing agreement, by applying their own tariff rates to the services they provided. The AT&T LECs' expert economist, Dr. Debra Aron, testified at length that she calculated damages in this manner. Reply Appx. 4-11 (Aron Tr. 79-82, 87-102). It is IDT that "utterly ignores" the record.

**2.   There Is No Need To Decide Which "Feature Group" Applies In Order To Calculate Damages.**

The AT&T LECs have calculated damages in accordance with the FCC rules and tariff provisions for "jointly provided" access. There is no legal basis for IDT's assertion that damages have to be calculated for a jointly provided "Feature Group A" arrangement. IDT cites no rule, order, or case for its position that one has to pigeonhole the facts of any case into any of the "Feature Groups" to calculate damages. Moreover, the AT&T LECs' tariffs do not price services by reference to Feature Groups. Instead, the tariffs set *a la carte* prices for the individual service components, which are called "rate elements" – *e.g.*, local switching, transport from an end

24

office to a tandem office, etc. See Appx. 180-83; see also AT&T LEC Mem. at 7-8 for an overview of the key elements.

### 3.    IDT's Analogy To "Jointly Provided Feature Group A" Falls Flat.

IDT cites statements by the AT&T LECs in FCC filings to the effect that, *if* one looks at the services provided by the AT&T LECs and CLECs for the calls at issue *on a combined basis*, the arrangement is analogous to a Feature Group A arrangement. But according to the FCC's orders, one does not look at the services on a combined basis to calculate price (and thus damages) unless both LECs *agreed* to calculate and then share revenues on a combined basis. See Section III.B.1 *supra.* Indisputably, there is no such agreement here; thus, one looks at each LEC *separately*. In the FCC's words, each LEC may "collect *separately* for the access services *it* provides." *In re MTS & WATS Market Structure,* ¶ 191.

### CONCLUSION

For the reasons set forth above and in their opening brief, the AT&T LECs respectfully request that the Court grant their motion for partial summary judgment and injunctive relief.

Dated: December 23, 2011                    Respectfully submitted,

                                            PLAINTIFFS

                                            By:   /s/ Demetrios G. Metropoulos

Richard M. Parr, Bar No. 15534250           Theodore A. Livingston (*pro hac vice*)
Timothy A. Whitley, Bar No. 00797660        Demetrios G. Metropoulos (*pro hac vice*)
AT&T Services, Inc.                         Michael T. Sullivan (*pro hac vice*)
208 S. Akard                                Robert E. Entwisle (*pro hac vice*)
Suite 2900                                  Mayer Brown LLP
Dallas, Texas 75202                         71 South Wacker Drive
Telephone (214) 757-3386                    Chicago, Illinois 60606
Facsimile  (214) 748-1660                   Telephone (312) 782-0600
                                            Facsimile (312)  701-7711

                                            *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

      The undersigned, an attorney, hereby certifies that on December 23, 2011, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court through ECF, which provides service on each party who is a registered ECF user.

      /s/  Robert E. Entwisle_____