IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWESTERN BELL TELEPHONE | § | |
| COMPANY, BELLSOUTH | § | |
| TELECOMMUNICATIONS, INC., | § | |
| ILLINOIS BELL TELEPHONE | § | |
| COMPANY, INC., MICHIGAN BELL | § | |
| TELEPHONE COMPANY, NEVADA | § | |
| BELL TELEPHONE COMPANY, | § | |
| PACIFIC BELL TELEPHONE | § | |
| COMPANY, OHIO BELL | § | |
| TELEPHONE COMPANY, | § | |
| SOUTHERN NEW ENGLAND BELL | § | |
| TELEPHONE COMPANY, and | § | |
| WISCONSIN BELL, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | 3:09-CV-01268-P |
| | § | |
| IDT TELECOM, INC., ENTRIX | § | |
| TELECOM, INC., and JOHN DOES 1-10, | § | |
| | § | |
| Defendants. | § | |

**<u>ORDER</u>**

Now before the Court is Defendants' Motion for Summary Judgment, filed on November 18, 2011. (Doc. 81.) Plaintiffs filed a Response on December 9, 2011. (Doc. 90.) Defendants filed a Reply on December 23, 2011. (Doc. 105.) Also before the Court is Plaintiffs' Motion for Partial Summary Judgment, filed on November 18, 2011. (Doc. 75.) Defendants filed a Response on December 9, 2011. (Doc. 95.) Plaintiffs filed a Reply on December 23, 2011. (Doc. 108.) After reviewing the parties' briefing, the evidence, and the applicable law, the Court

the Court DENIES Defendants' Motion for Summary Judgment, and GRANTS Plaintiffs'

Motion for Partial Summary Judgment.

### I.     Background

Southwestern Bell Telephone Company, Bellsouth Telecommunications, Inc., Illinois

Bell Telephone Company, Indiana Bell Telephone Company, Inc., Michigan Bell Telephone

Company, Nevada Bell Telephone Company, Pacific Bell Telephone Company, The Ohio Bell

Telephone Company, The Southern New England Telephone Company, and Wisconsin Bell, Inc.

(collectively, "Plaintiffs") brought this suit against IDT Telecom, Inc., Entrix Telecom, Inc. and

John Does 1-10 (collectively, "Defendants") for failure to pay intrastate, interstate and

international federal and state tariffs for use of Plaintiffs' telecommunications network. (*See*

*generally* Pl.'s Compl., Doc. 1.)

Plaintiffs are "local exchange carriers" ("LECs"); LECS are local telephone companies

providing traditional land-line phone services.   LECs typically serve a small local service area

covering a few local exchanges (exchanges being designated by the first three numbers of a

seven-digit phone number).   There are two types of LECs: (1) incumbent LECs ("ILECs"), such

as Plaintiffs; and (2) competitive LECs ("CLECs").   ILECs, such as Plaintiffs, operated as

monopolies in a given area until the local phone service market was opened to competition by

the Telecommunications Act of 1996 ("1996 Act").   The 1996 Act allowed for the emergence of

new LECs, the CLECs, to compete with the ILECs.

Prior to the 1996 Act, all customers in a local exchange carrier's geographical area were

served by one LEC, which connected the caller and recipient of a local call.   The 1996 Act

opened local service areas up to competition, so that different carriers might serve the caller and

the recipient even if they were in the same exchange area. *Alma Commc'n Co. v. Mo. Pub. Serv.*

*Comm'n*, 490 F. 3d 619, 620 (8th Cir. 2007).  Land-line calls placed and received within a "local service area" are local calls, as opposed to "toll" or "long-distance" calls.  *Id.*  When two LECs are involved in a local call, both incur costs for the call, since the caller's carrier must originate the call and the receiver's carrier must transport the call from the point of that carrier's connection with the originating carrier's network and terminate the call.  The carrier for the party originating the call is compensated by its customer, the caller.  The 1996 Act also sets forth new standards requiring carriers to enter into "reciprocal compensation arrangements."  These arrangements require the carrier of the call to compensate the recipient's carrier for its costs in transporting and terminating local calls.  *See* 47 U.S.C. § 251(b).

Local telephone networks are needed to not only make local calls, but also to originate and terminate long-distance calls.  *Advamtel, LLC v. AT&T Corp.*, 118 F. Supp. 2d 680, 681 (E.D.V.A. Oct. 27, 2000).  Typically, when an end user dials a long-distance number, the LEC serving that customer routes it to the customer's long-distance carrier.  *Id.*  This service is referred to as "originating access."  *Id.*  The long-distance carrier then routes the call to the local carrier serving the recipient of the phone call, and that local carrier completes the call by routing it to the called customer.  *Id.*  This service is referred to as "terminating access."  *Id.*  Thus, long-distance calls typically cannot be completed without originating and terminating access from a LEC.  Therefore, long-distance carriers must order what is referred to as "access services" from the LEC, whether an ILEC or a CLEC, that serves the caller.  *Id.*  These LECs impose access charges on the long-distance carriers in exchange for access to the local network to originate long-distance calls.  *Id.*

Defendants provide long-distance phone service through prepaid calling cards, which function the same way as a traditional long-distance call.  Generally, the calling party gains

access to the calling card provider's platform by dialing a toll-free number (also known as an 8YY number), and the prepaid calling card provider transmits the call to the receiving party in another state or country. The use of the 8YY number alerts the originating LEC to charge the prepaid calling card provider for access charges. Defendants, however, sell prepaid calling cards that provide their customers with the choice of using an 8YY number or a local access number ("LANs"). These LANs are provided to Defendants through contracts with CLECs, which are LECs that compete with Plaintiffs.

When a calling party uses a LAN, rather than an 8YY number, the call is routed through the designated CLEC, instead of being transmitted straight to Defendants' platform. The calling party's use of the LAN makes the call appear local, even if the call is ultimately terminated in another state or country. Therefore, when a call using a LAN originates on one of Plaintiffs' networks, Plaintiffs are unaware that the call is destined for Defendants' platform and may terminate in a long-distance area. Thus, Plaintiffs cannot distinguish between local calls that originate and terminate in a local area, and calls placed through a LAN that are routed through Defendants' platform for a long-distance location. Accordingly, Plaintiffs do not bill Defendants for calls that are placed through a LAN.

Plaintiffs allege Defendants owe them unpaid access charges, in the form of federal and state tariffs, for intrastate, interstate, and international calls that originate on Plaintiffs' networks using the LANs provided by Defendants' prepaid calling card. Plaintiffs contend that because Defendants are allowing their customers to use local numbers, instead of toll-free numbers, they are disguising the long-distance calls as "local calls," and therefore Plaintiffs are not receiving the access charges they are entitled to.

## II.    Legal Standard & Analysis

### A. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such absence. *See Celotex*, 477 U.S. at 323. However, all evidence and reasonable inferences to be drawn there from must be viewed in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The party defending against the motion for summary judgment cannot defeat the motion, unless he provides specific facts demonstrating a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *See id.* at 249–50. In other words, conclusory statements, speculation, and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *see also Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993) ("[U]nsubstantiated assertions are not competent summary judgment evidence." (citing *Celotex*,

477 U.S. at 324)).  Further, a court has no duty to search the record for evidence of genuine

issues.  *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

### B. The Telecommunications Act & the 2006 FCC Order

The first issue to be determined is whether the FCC's 2006 Order governs the traffic at

issue, and therefore, Plaintiffs are entitled to access charges.

Plaintiffs allege that the FCC's 2006 Order applies to all prepaid calling cards and

therefore, access charges are appropriate in this situation.  Defendants counter that the 2006

Order does not make such sweeping statements and that reciprocal compensation, as set forth by

the Telecommunications Act of 1996, governs the traffic at issue.  Defendants argue that the only

traffic to be considered in this case is the traffic that flows from Plaintiffs to the CLECs, and

consequently, reciprocal compensation applies to the calling card traffic.

The Court will address both the 1996 Act and the 2006 Order, in turn.

### a.  The 1996 Act

The Telecommunications Act of 1996 amended the Communications Act of 1934, and

served to open up local telephone markets to competitive common local exchange carriers

("CLECs").  Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, at Part II

(1996) (hereinafter "1996 Act).  Prior to the 1996 Act, local telephone markets were monopolies

of each ILEC.  As a result of the 1996 Act, CLECs were allowed to enter the market and acquire

new telephone numbers to distribute to their customers, thereby allowing consumers to receive

local exchange service from CLECs, rather than only ILECs.  *See* 47 U.S.C. § 251(b)(2); *In re*

*Implementation of the Local Competition Provisions in the Telecomms. Act of 1996,*

*Interconnection between Local Exch. Carriers & Commercial Mobile Radio Serv. Providers*, 11

F.C.C.R. 15499, 15509 ¶ 16, n. 11 (1996).  This also applied to prepaid calling card providers,

which enabled CLECs to offer local telephone numbers to prepaid calling card providers, thereby allowing the providers' customers to initiate prepaid calling card calls on local numbers. *Id.*

The 1996 Act also ensured that a CLEC's customer could make local calls to an ILEC's customer by requiring CLECs and ILECs to enter into interconnection agreements to govern the mutual exchange of calls between their networks. 47 U.S.C. § 251(a)(1). This arrangement is called "reciprocal compensation." § 251(b)(5) of the 1996 Act applies to the relationship among LECs, both ILECs and CLECs, and creates a "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). All traffic is subject to § 251(b)(5) unless specifically carved out by § 251(g). § 251(g) provides that telecommunications traffic is not governed by reciprocal compensation if: (1) the traffic is to a long-distance carrier or information access providers; and (2) the traffic was subject to an equal access and nondiscriminatory interconnection restriction or obligation that pre-dates the 1996 Act.

Defendants allege that because the services provided by Plaintiffs do not fall within the carve-out of § 251(g), their services are governed by § 251(b)(5) and Plaintiffs are precluded from collecting access charges from Defendants. (Defs.' Mot. at 16.) Defendants allege that the relevant traffic is that between Plaintiffs' ILECs and the CLECs, not the traffic that is then routed to a long-distance carrier to complete a long-distance or international call. Defendants allege that "there is nothing to prevent a CLEC from offering originating services for interstate traffic as local exchange service offerings, rather than as access offerings, such as [Defendants] [have] obtained here." (*Id.* at 19.)

Plaintiffs counter that while Defendants may choose CLECs to transport their calls via LANs, Plaintiffs are still entitled to receive access charges for the services they provide when

they originate Defendants' long-distance traffic and transfer it from Defendants' retail end users to Defendants' specified CLEC. (Pls.' Resp. at 2.) Plaintiffs argue that reciprocal compensation does not govern the traffic at issue and that Defendants' reliance on reciprocal compensation is an attempt to evade access charges. Plaintiffs contend that § 251(g) supports their right to receive access charges as it preserved the "receipt of compensation" by local exchange carriers for "exchange access." 47 U.S.C. § 251(g). Plaintiff argues that "neither the FCC nor the courts has wavered from the core principle that governs this case: long-distance phone calls delivered to interexchange carriers are subject to access charges, not reciprocal compensation." (Pls.' Resp. at 15.)

### b. 2006 Order

Pursuant to the powers given to it under the Communications Act, the FCC issued a declaratory order on June 1, 2006, addressing, among other things, the applicability of access charges for calls made using prepaid calling card services. *In re Regulation of Prepaid Calling Card Servs.*, 21 FCC Rcd. 7290, 7290 (2006), *vacated in part on other grounds*, *Qwest Servs. Corp. v. FCC*, 509 F.3d 531 (2007) (hereinafter, the "2006 Order"). The 2006 Order initially dealt with the classification of two types of "enhanced" prepaid calling cards—menu-driven prepaid calling cards and prepaid calling cards that utilized Internet Protocol technology. The issue before the FCC was whether the cards were telecommunications services or information services. *Id.* at 7291. This distinction would determine whether the prepaid calling card providers that sold these two types of cards were required to pay access charges to the LECs that originated the calls, as well as whether they would have to contribute to the Universal Service Fund ("USF"). *Id.* at 7290. The FCC held that both types of prepaid calling cards were telecommunications services, and therefore, their providers were subject to access charges and

USF contributions. *Id.* at 7293, 7300. The FCC also stated that in light of these findings and prior findings, all prepaid calling card providers would be treated as telecommunications service providers. *Id.*

The FCC then went further and set forth rules applicable to all prepaid calling providers. *Id.* at 7298. The FCC found interim rules necessary "to provide regulatory certainty and ensure compliance with [the] existing access charge and USF contribution requirements while [the FCC] consider[ed] broader reform of [the] rules." *Id.* If such rules were not in place, the FCC was concerned that it would "create incentives for providers to reduce exposure to charges they may owe or evade them altogether." *Id.* at 7293.

The Court finds it important to note the language used in the 2006 Order. The FCC specifically states that as a result of its finding that the two specific types of prepaid calling cards offer telecommunications services, "these providers are now subject to all of the applicable requirements of the Communications Act and the Commission's rules, including requirements to contribute to the federal USF and to pay access charges." *Id.* at 7298. The FCC goes on to state it will "set forth some additional requirements that will apply, at least on an interim basis, to all prepaid calling card providers." *Id.* Finally, having found these two specific types of prepaid calling cards are in the same classification as "basic" prepaid calling cards, the FCC held that the providers are subject to the same rules and requirements as "basic" prepaid calling cards, including access charges. Therefore, the 2006 Order expressly states that all prepaid calling cards that provide telecommunication services are subject to the same rules.

### c. **Analysis**

The determinative issue in this case is a purely legal question—whether the FCC's interim rules as set forth in the 2006 Order apply to prepaid calling card providers that supply

LANs access to their platforms. Plaintiffs claim that the 2006 Order applies to more than just the two specific calling cards it addressed. Plaintiffs state that the 2006 Order recognizes that access charge obligations apply to all prepaid calling card providers. (Pls.' Mot. at 12.) Plaintiff argues that Defendants' cards are "just like basic calling cards" which the FCC has always "treated as telecommunications services." (*Id.* at 19) (quoting *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 537 (D.C. Cir. 2007)). Therefore, this designation as a prepaid calling card offering telecommunication services means Defendants are responsible for access charges.

Defendants argue that the 2006 Order addresses only the two specific types of prepaid calling cards at issue in the 2006 Order and that "the critical holding in the Order" is not extended to "all." (Defs.' Mot. at 20.) Defendants also claim that because of the difficulty in rating locally-dialed calls as subject to access, telephone numbers are relied upon as a proxy for geographic location. (*Id.* at 21.) Finally, Defendants point to the Arizona Dialtone Petition to demonstrate that "the implementation solution in the 2006 Order does not work for locally-dialed calls." (*Id.*)

The Court acknowledges that interested third parties have argued that the 2006 Order does not apply to the facts in this case and that Arizona Dialtone, Inc. submitted a petition seeking guidance concerning the 2006 Order and its applicability to prepaid calling card provider obtained local numbers from a CLEC. (Defs.' App. at 437-70, *Arizona Dialtone Inc. Petition for Reconsideration*, WC Docket 05-68 (Aug. 31, 2006.)) However, the 2006 Order provides courts with interim rules applicable to "all prepaid calling card providers." Thus, it is clear that until the FCC provides further guidance, all prepaid calling card providers are to be treated as telecommunications service providers and therefore, they are responsible for access charges as

detailed in the 2006 Order. Accordingly, prepaid calling card providers who utilize LANs, such as Defendants, are responsible for access charges.

It is also worth noting that while it may be difficult to find a solution for rating locally-dialed calls, it appears to be possible. The 2006 Order adopted rules for 8YY dialed-calls because the industry practice of "comparing the NPA-NXX codes of the calling and called parties" does not work for 8YY calls. 2006 Order at 7315, n. 89. The FCC addressed this issue through certification and reporting requirements that compel the prepaid calling card provider to share the necessary information with the carriers that it uses to transport traffic to and from the platform. *Id.* at 7300. Such difficulties with reporting are directly analogous to the phone calls at issue since the long-distance calls placed by Defendants' customers appear local through the use of the LANs, thereby making it difficult to use the industry-practice of comparing the codes of the calling and called parties. However, simply because a third party is placed in the middle of the calling card traffic, it does not mean that Defendants should not be held responsible for the access charges. The 2006 Order's interim rules state "all" prepaid calling cards that provide telecommunication services are subject to these rules. Therefore, the interim rules apply to the traffic at issue in this case.

While reciprocal compensation typically governs the exchange of traffic between CLECs and ILECs, the traffic at issue in this case involves more than the traffic between Plaintiffs and CLECs. The prepaid calling card providers and the CLECs are allowing customers to make long-distance or international phone calls by dialing a local access number. While the phone calls are the type that are subject to access charges, the ones who originate the phone call (Plaintiffs), are unaware of the type of phone call being placed due to the use of a LAN. Defendants appear to be looking at the traffic in parts, instead of analyzing the traffic as a whole.

If the traffic between Plaintiffs and Defendants' designated CLECs was the only traffic at issue, then reciprocal compensation would govern. However, this traffic involves more than local traffic; Plaintiffs are originating long-distance phone calls without receiving the access charges to which they are entitled. Thus, reciprocal compensation does not govern the traffic at issue and the traffic is subject to access charges.

Defendants argue that the "carve-out" provided under § 251(g) of the 1996 Act does not apply to the traffic in this case. The Court disagrees. First, the traffic is to a long-distance provider, as the traffic at issue is destined for long-distance or international locations. Second, the 1996 Act provides that local exchange carriers shall "provide exchange access...in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply" prior to the 1996 Act. 47 U.S.C. § 251(g). "Exchange access" is defined as "the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." *Id.* § 153 (20). The 1996 Act defines "telephone toll service" as "telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service." *Id.* at § 53 (55). Given the nature of the traffic, the fact that it is originating with Plaintiffs and terminating in a different exchange area, as well as given that retail end users are using a prepaid calling card to make the traffic (indicating that the coverage is not covered by their contracts with Plaintiffs), § 251(g) applies.

Defendants argue that there is no pre-1996 obligation applicable to CLEC-served calling card traffic that operates in the same territory as an ILEC. (Defs.' Mot. at 18.) However, the traffic in this case cannot be viewed in a vacuum; it must be viewed as the entire transaction, not simply the ILEC to CLEC traffic. Traditional, basic prepaid calling cards must pay access fees.

In those situations, there are LECs who originate and terminate the call—just as we have here. The 2006 Order applies to this situation, and therefore, reciprocal compensation does not control the traffic at issue.[1]

Accordingly, because the Court finds the 2006 Order applies, the Court DENIES Defendants' Motion for Summary Judgment and GRANTS Plaintiffs' Partial Motion for Summary Judgment.

### C. Tariffs

While the Court finds that the 2006 Order applies to the situation at hand, further inquiry must be made in order to determine whether Defendants are responsible for access charges on the facts of this case. To collect charges pursuant to a tariff, Plaintiffs must demonstrate that: (1) they operated under a federally filed tariff; and (2) that they provided services to the customer pursuant to that tariff. *Advamtel*, 118 F. Supp. 2d at 683.

#### a. Background

Under the Communications Act of 1934, later amended by the Telecommunications Act of 1996, every common carrier must file with the FCC "schedules" ("tariffs") "showing all charges" and "showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a); *see also Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000). Further, a carrier may not lawfully "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such

---

[1] Defendants also cite *WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C. Cir. 2002), *cert. denied*, 528 U.S. 1012 (2003), for the proposition that the traffic exchanged is between two LECs—Plaintiffs' ILECS and CLECs—and are services that are not offered to "interexchange carriers" or "information service providers." However, the issue in *WorldCom* was whether the FCC had authority to take certain action, not whether reciprocal compensation would govern the traffic between two LECs which later travels to a third party. Additionally, the factual situation in *WorldCom* is distinct from the facts presently before the Court.

charges, except as specified in such schedule." 47 U.S.C. § 203(c)(3); *see also Evanns*, 229 F.3d at 840. Tariffs define the legal relationship between a common carrier and its customers and consist of the terms and conditions on file with the FCC. *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 552 (2d Cir. 1996). Moreover, "federal tariffs are the law, not mere contracts." *MCI Telecomms. Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir. 1992); *see also Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d at 552 (filed tariffs "have the force of law and are not simply contractual."); *Carter v. Am. Tel. & Tel. Co.*, 365 F.2d 486, 496 (5th Cir. 1966) ("[A] tariff, required by law to be filed, is not a mere contract. It is the law.").

Once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to "conclusively and exclusively enumerate the rights and liabilities" as between the carrier and the customer. *Am. Tel. & Tel. Co. v. New York City Human Res. Admin.*, 833 F. Supp. 962, 970 (S.D.N.Y. 1993); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998). Most pertinent to the instant case, customers are charged with notice of the terms and rates on file with the FCC and "may not bring an action against a carrier that would invalidate, alter or add to the terms of the filed tariff." *Evanns*, 229 F.3d at 840. Furthermore, tariffs properly filed with the FCC are public records. *Katz v. MCI Telcomm. Corp.*, 14 F. Supp. 2d 271, 274 (E.D.N.Y. 1998).

"To collect charges pursuant to a tariff, Plaintiffs must demonstrate: (1) that they operated under a federally filed tariff; and (2) that they provided services to a customer pursuant to that tariff." *Advamtel*, 118 F. Supp. 2d at 683. It is not disputed that Plaintiffs operate under a federally filed tariff. The parties dispute, however, whether Plaintiffs provided services pursuant to their tariffs. Plaintiffs contend there is no dispute that they provided Defendants with the services as set forth in their filed tariffs. Defendants argue the traffic is not covered by Plaintiffs'

tariffs, and that as a matter of law the tariffs do not apply. The Court disagrees and it appears that one, if not more, of Plaintiffs' tariffs apply to the traffic in issue. Accordingly, the Court DENIES Defendants' Motion for Summary Judgment as it relates Plaintiffs' tariffs.

### D. Constructively Ordered Services

In order for Defendants to be liable for access charges, they must have ordered the services provided for in Plaintiffs' tariffs. A party can "order" such service, thereby becoming a "customer," in two ways: (1) by "affirmatively" ordering the service by pre-subscribing to the service; or (2) by constructively ordering the service. *United Artists Payphone Corp. v. New York Tel. Co.*, 8 F.C.C.R. 5563, at 13 (1993); *AT&T v. City of New York*, 83 F.3d 549, 553 (2d 1996). There is no dispute that Defendants did not affirmatively order services. Therefore, Defendants can only be held liable for the access service if Plaintiffs' tariffs specifically describe the traffic in issue, and Defendants constructively ordered the service.

A party constructively orders a carrier's services when "the receiver of the services: (1) is interconnected in such a manner that it can expect to receive access services; (2) fails to take reasonable steps to prevent the receipt of access services; and (3) does in fact receive such services." *Advamtel,* 118 F. Supp. 2d at 685. "In order to find that a service has been constructively ordered, the carrier must show 'affirmative action...to establish a [customer] relationship.'" *Id.* (citing *City of New York*, 83 F.3d at 553-54.) This affirmative action includes the failure to "take reasonable steps" to avoid receiving the carrier's services. *Id.*

Defendants contend that they have not constructively ordered services. They argue that they are not "interconnected" with Plaintiffs as interconnectedness requires the physical linking of two networks, not simply the transport and termination of traffic. Defendants also contest

receiving Plaintiffs' services and allege that by ordering services from CLECs, they affirmatively acted to prevent receipt of access services by Plaintiffs.

The Court disagrees. Courts have found the constructive order doctrine may be applicable to an interexchange carrier even when the interexchange carrier is not directly connected to the LEC. *Alliance Comm'cns v. Global Crossing Telecomm.*, 690 F. Supp. 2d 889 (D.S.D. Feb. 11, 2010) (relying on *Advamtel, LLC v. AT&T Corp.*, 118 F. Supp.2d 680 (E.D.Va. 2000) and *AT&T Commc'ns of the Midwest, Inc. v. Iowa Utilities Bd.*, 687 N.W.2d 554, 561 (Iowa, 2004)). Furthermore, the Court finds that Defendants did not take reasonable and affirmative steps to prevent receipt of the services. Instead, Defendants appear to have simply added an additional step by purchasing LAN services from CLECs in order to avoid access fees. This does not suggest any affirmative action to prevent receipt of services, especially since Defendants must have known that not all calls placed by its prepaid calling card customers would originate on CLEC-served phone lines and that CLECs would not own all the facilities used to make the call. It seems reasonable that Defendants knew that other companies, such as Plaintiffs, would be needed to originate some of the calls and therefore, Defendants would be liable for access charges. Finally, Defendants did in fact receive the services specifically described in Plaintiffs' tariffs and therefore, Defendants constructively ordered Plaintiffs' services.

Defendants also rely on *Alliance Communications* to support their contention that they did not "constructively order" services from Defendants. *See Alliance Commc'ns*, 690 F. Supp. 2d at 896. However, considering the multitude of carriers involved in *Alliance*, the facts in *Alliance* are distinct from this case. Additionally, the services were found not to be

constructively ordered because the court found the services described in the relevant tariff did not comport with the actual services received, not due to the presence of an intermediate LEC.

Accordingly, as it pertains to the "constructive ordering" doctrine, Defendants' Motion for Summary Judgment is DENIED.

### E.  Damages & the Granting of an Injunction

A fact issue remains as to when Plaintiffs knew or should have known about the traffic at issue and therefore, damages will be addressed at trial.  In addition, based on the finding of liability, Plaintiffs are entitled to an injunction.  Such injunction will issue when the Court issues its final order.

### III.    Conclusion

For the foregoing reasons, the Court DENIES Defendants' Motion for Summary Judgment, and GRANTS Plaintiffs' Motion for Partial Summary Judgment.


**IT IS SO ORDERED.**


Signed this _9th_ day of March, 2012.


JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE